The AMERICAN BANK NOTE COMPANY *v.* TRACY R. EDSON.

(GENERAL TERM, FIRST DISTRICT, JANUARY, 1870.)

Defendant being a member of a partnership firm, purchased from one of its employees the patent right in an article of use and value in the firm business, and without disclosing or being asked to disclose the terms upon which he had purchased, offered to sell it at an advance to the firm; the firm had the offer under consideration for some months, using the patented article meanwhile, and finally declined to buy, preferring to pay defendant a royalty for use of the article, which it did.—*Held*, the rights, if any, which the firm originally had to claim the defendant's purchase as for its benefit, could not be insisted on after its dissolution. BRADY, J., dissenting.

*Held*, further, that said patent right did not pass under a transfer of the property of the firm. Id.

And the said firm having with other firms, and one G., all engaged in the same business, entered into articles of association, reciting that the parties thereto, as firms and individuals theretofore and

then, engaged in the business of, &c., were desirous to unite their establishments, and also reciting, as follows: "We agree, that upon signing these articles, all the machinery, presses, tools, instruments, plates and dies, stock of materials, furniture and effects belonging to our establishments in the business, * * * * or the business collateral thereto, shall be and by virtue of these articles are transferred to the trustees, &c,"—*Held*, the agreement included all the property of the establishments, whether conducted by firms or individuals, but did not embrace individual property of members of firms, nor any property not used in the establishments as they existed previous to the association. Id.

And that this was so, although the articles were signed by the individual members of the firms. Id.

IN 1858, and for a number of years previously, the firm of Rawdon, Wright, Hatch & Edson, had existed as the leading house in the bank note engraving business, and the defendant was a member of that firm.

One Matthews, who was in the employ of the firm, discovered a new process or ink for printing bank notes. This ink was subsequently known by the designation of the "green tint."

On 29th April, 1857, Matthews sold to the defendant the absolute right and property in this discovery, with authority to take out letters patent, in the name of Matthews, for the benefit of Edson.

On 30th June, Edson procured the patent in the name of Matthews, but held it for his own use under the assignment.

Edson agreed to pay Matthews, for the transfer of this patent, &c., $500 in cash, and two dollars for every 1,000 impressions on which the ink should be used, until Matthews received $3,500; and all expenses of taking out the patent and testing the ink were to be at Edson's cost.

Immediately after Edson obtained the right to this discovery he offered it to the firm, of which he was a member, for $3,000 as he testifies, and the payment of a royalty of five dollars for every 1,000 impressions that might be printed by them; they to pay the expense of patenting and testing the discovery. One of the other members of the firm states that it was offered at a higher price and the same royalty, and that the firm declined the offer. The referee found the offer to

have been as stated by Edson. It is stated by Edson that the firm held the matter under advisement some three months, while they were testing the discovery.

From May until fall of 1857, the matter was under consideration, when the firm decided not to buy, and concluded that they would prefer to take their chance with others in the use of it, and pay for the right to use it. From that time until the formation of the plaintiff's corporation, on 29th April, 1858, the firm of Rawdon, Wright, Hatch & Edson used this ink, and charged their customers five dollars per thousand impressions, which was placed by the firm to the credit of Edson.

On the 29th April, 1858, a new firm was formed and was composed of the individual members of six firms engaged in that business and Mr. Gavit. It was agreed in the articles of association that, upon signing the articles, all the machinery, presses, tools, instruments and implements, plates and dies, stock of materials, furniture and effects *belonging to their establishments*, in the business of bank note engraving and printing, or the business collateral thereto, and all orders and contracts, should be transferred and assigned to the new company.

After the organization of the new company, "the green" tint was used in their work, and the charge of five dollars was made to customers therefor, and this amount was paid over to Edson, the same as under the old firm, though the referee found there was no express arrangement in reference to its use.

In October, 1860, a committee of the new company, which had been appointed some time previously, on an opinion by Danl. Lord, Esq., reported that Edson had a right to receive the compensation for the use of the green tint, and the board appointed a committee to negotiate with him for the sale of his entire interest. Edson refused to sell, and the company continued the payments to him until 1863, amounting to large sums of money.

On these facts the referee found that the right to use the green tint passed to the plaintiffs under the articles of association; that the money received by the defendant was with-

out right, and the plaintiffs were entitled to have the same repaid, with interest.

From this judgment the defendant appealed to this court.

*Wm. F. Allen* and *Jno. E. Parsons*, for the appellant.

*Joseph H. Choate*, for the respondent.

Present—INGRAHAM, BARNARD and BRADY, JJ.

By the Court—INGRAHAM, P. J.    It is not claimed, on the part of the plaintiffs, that the discovery made by Matthews was, while owned by him, subject to any claim of the firm in whose employ he was, or that he had not a perfect right to use or sell the patent for it while under his control.    His relations to the firm of Rawdon, Wright, Hatch & Edson were at no time such as to impose on him any duty or obligation to give the benefit of his discovery to that firm.    Whatever reservation there may have been made, in the articles of association, of authority to the firm of Rawdon, Wright, Hatch & Edson to convey shares to Matthews for his interest in the firm, it was after the transfer of this patent to Edson, and there was no proof of any such subsisting interest ever existing, either before or after such transfer.

The case, then, presents two questions for our decision, one whether the firm of Rawdon, Wright, Hatch & Edson, by their relations with Edson, could claim the purchase by Edson to be for their benefit ; and the other, whether the right to the use of the discovery under the patent passed to the plaintiffs, by virtue of the articles of association.

The terms of the partnership of the first firm were not in evidence, and if there is anything which prevented Edson from obtaining this patent for his own use, it must be found in the general rules applicable to partners, viz.: That one partner cannot deal on his own account in any matter at variance with the business of the partnership, or that would deprive the firm of any portion of his skill, industry or capital, which he is bound to employ in the business of the

firm, or to prefer his own interest to that of the firm, or purchase articles needed for the firm on his own account, or generally make bargains for himself by which the firm sustains a loss, or take to himself benefits, the profits of which legitimately belong to the firm.

The true meaning of all such provisions is to require the members of the firm to devote their time, labor and skill to the benefit of the firm, and not to themselves individually, and to forbid their purchasing, for their own use, articles in which the firm necessarily deal, at the risk of having the same claimed by the firm as belonging to them, with a right to the profits arising therefrom.

I do not understand these rules as prohibiting such dealings, nor as making void any such contracts which violate these rules, but only as subjecting the member of the firm who makes them to a liability to the firm to render to them an account of the profits.

No such claim was ever made by the firm during its existence. They had notice of the discovery and the patent, they had notice that Edson was interested in it, they had the offer from Edson to sell it to them, they had that offer under consideration for months while they were using the patented article, and they finally refused to purchase, expressing their choice to be to use and pay for the same, rather than to be the purchaser, and they did continue to pay for the same down to the time when the firm ceased to exist by merger in the corporation.

Whatever may have been their rights, originally, I think there can be doubt that their rights were waived, and that their refusal to accept the purchase when offered, and their neglect to claim any rights which they might have possessed, originally, prevented any enforcement of such a claim after the dissolution of the firm. I do not mean to concede that the purchase of a patent right, such as this was, would be a violation of duty on the part of Edson; but I deem it unnecessary to discuss that question, because it seems to me, that even

if it were so, the acts of the firm were such as to put an end to any claim which they might otherwise have made.

It is suggested in the respondent's points, that Edson did not communicate to the firm the terms on which he had become the purchaser, and therefore, they were not bound by his offer and their refusal.

It must be observed, that no representation was made as to its cost, nor was any such inquiry made of Edson. He was negotiating the sale, as of property belonging to himself, and there is no finding by the referee that Edson was guilty of any intentional fraud; on the contrary, the referee, in his opinion, exonerates him from any such imputation, for anything done in regard to this offer to his firm. It is obvious, that at this time, the firm did not consider the invention of sufficient value to warrant the payment of the price suggested. The demand for such printing being at that time comparatively small, the firm preferred paying a royalty for its use, rather than to become the purchaser.

The omission to insert this patent in the inventory of the property and effects of the firm, or in the schedule of the property transferred, is further evidence that at the time when the existence of the firm was to terminate, they did not consider themselves in any way the owners of this patent.

The second inquiry is, whether it passed to the plaintiffs under the articles of association signed by the members of the different firms in their individual capacities. From what has already been stated, it is apparent that it could not pass as the property of Rawdon, Wright, Hatch & Edson, because it did not at any time belong to them during the existence of their firm; but, on the contrary, they had expressly refused to become such owners. Did it pass as the individual property of Edson? It can hardly be urged that these articles were intended to transfer to the association all the private property of the individual, although such property might have been tools, instruments, furniture, &c., applicable to the business of bank note engraving and printing, which they might have owned, if the same had not been used in the establishment of

one or more of the contracting parties. Such property should still remain the property of the individual owning it at the time of executing the articles.

The articles of association recite that the parties to it as firms and individuals theretofore and then engaged in the business, &c., were desirous of uniting their establishments The evident meaning of this recital is, that such as had firms were to unite, and those who were individually carrying on the business were also to unite in the consolidation.

The portion of the agreement which specially defined what was to be transferred is contained in the second article, viz. : " We agree that upon signing these articles, all the machinery, presses, tools, instruments, plates and dies, stock of materials, furniture and effects *belonging to our establishments* in the business of bank note engraving and printing, or the business collateral thereto, shall be, and by virtue of these articles are transferred to the trustees, &c."

These words include all the property of the establishments for the business of bank note engraving and printing. Whether these establishments were conducted by firms or by individuals, all such articles which belonged thereto were to go into the common property of the association. It did not embrace individual property of members of firms, nor any property not used in the establishments as they existed previous to the association.

The separate execution by the individuals is controlled by the provisions of the second article which specifically declares the property to be transferred, and confines it to that which appertained to their respective establishments. It did not include a patent right belonging to an individual member of one of the firms which had never belonged to such firms, but had always been acknowledged to be the individual property of some other person. If there could be any doubt as to what was to be transferred under the second section of the articles of association, that would be removed by the provisions of the third section which provides for the distribution of the shares of stock to the respective firms and to Mr. Gavit, who

was not a member of any firm, and which states that such shares were so issued and delivered to each firm or individual, and should represent the estimate and agreed value of the property, &c., sold and transferred to the said company.

The examinations of the firms show that the property transferred was the property of such firms, and the omission of any individual member of such firm shows that it was not contemplated that the individual property of any member was to be included. Likewise the omission of any compensation to any such individual member shows that no property of such person had been taken into the estimate of valuation for which stock was to be issued.

The like inference must follow from the inventory of the property of Rawdon, Wright, Hatch & Edson, as taken for this purpose. It excludes the idea that the "green tint" entered into such valuation, or was considered at that time as forming any part of the assets of that company.

In whatever view this question is examined, it seems to me clear that, at the time of entering into these articles, neither the old firm, of which Edson was a member, nor any of the parties uniting to form the new association, considered this patent as their property, or as transferred to the association; that nothing was allowed for it in the appraisement, and, although it had cost a considerable sum, no provision was made for its transfer, and no allowance made to any one as having transferred it to the association. The probability is, that at the time of forming these articles its value was uncertain; that the price was more than they were willing to pay for it, and that, as appears from their subsequent conduct, the associates deemed it wiser to collect the royalty and pay it over rather than to assume the ownership by purchase and the expenditure of the money demanded.

The subsequent course of the plaintiff, in continuing its use and paying the royalty for it from 1858 to 1863 without objection, and the attempt to negotiate in 1860 for the purchase from Edson, shows clearly the understanding of the

trustees as to their rights, and that up to 1860 none of them doubted the right of Edson to the patent as his property.

It may be that the agreement with Rawdon, Wright, Hatch & Edson, by which they had the use of this "green tint" on payment of the royalty, may be a continuing agreement; and, if so, that it might be considered as transferred to the plaintiffs, although the omission to include it in the inventory taken at the time would throw doubt on that supposition. That, however, is not necessary to be examined at this time, and is only referred to as explaining the letter of Edson to the secretary of the treasury in regard to the use of the "green tint" by the plaintiffs.

The views above expressed render it unnecessary to examine the other points raised on this appeal as to the effect of these payments being voluntarily made for so long a period of time, and during a portion of time when he was not trustee or acting in that relation to the stockholders.

The judgment should be reversed and a new trial ordered, costs to abide event.

BARNARD, J., concurred.

BRADY, J., gave an opinion for reversal, as follows:

My conclusions in this case, are:

1. That the purchase of the patent from Matthews by the defendant, was, in form, the individual acquisition of an important element in the business of the firm, namely, ink.

2. That the purchase, involved the use of capital, and its development and success, time and diligence, and if successful, which it was, would give him an advantage over his copartners, by subjecting them to the payment of a royalty for its use, if desirable in their business.

3. That such purchase was therefore, a violation of his duty to his copartners, and an act of infidelity to his associates, which could not inure to his individual benefit, to their exclusion.

4. That such acts and results, are prohibited and guarded against, by doctrines which are well established and clearly expressed in the elementary books. (3 Kent's Com., p. 52;

Story on Part., §§ 177, 178 ; Parsons on Part., p. 225.      See also, Smith's Mercantile Law, p. 37, and cases cited by referee), and are particularly applicable in this case, because the purchase was made from a person in the employment of the firm.

5. That the purchase having been thus made, the title to the patent vested not in Edson alone, but equitably in himself and his partners, subject only to their burden of the consideration paid, and of the expenditure made by him in relation to it.

6. That the offer by him to sell it to his associates does not change these results, inasmuch as he did not disclose to them, at the time of such offer, his entire interest in it, or the absolute nature of the purchase made by him, and did not then or at any time offer to make the transfer of it, or any interest in it upon the terms upon which he had bought it, but at a profit and with a condition of great advantage to himself.

7. That there is nothing in the case which justifies the legal conclusion that his partners waived their rights in the purchase growing out of their relations to him.

8. That the patent, therefore, belonging to the firm, passed to the plaintiffs, under the articles of association, but that the payments of royalty cannot be recovered back by them, whatever may be the equities between the defendant and his partners, inasmuch as they were made with full knowledge of the facts, and,

9. That for these reasons the judgment should be reversed. Judgment reversed.