MARTHA E. SEYMOUR, Respondent, *v.* THE SPRING FOREST CEMETERY ASSOCIATION et al., Appellants.

Unless some special fund has been provided for the payment of the obligations of a corporation not yet due, or unless some special liquidation thereof has been ordered by it, a director owes it no duty to buy in the obligations, and in the absence of any fact or circumstance charging him with a present duty to act for it, which duty is, or may be, inconsistent with a personal purchase, he may purchase for himself, and although he purchases the obligations at less than their face, he may enforce them for the full amount against the corporation.

Even if such a purchase be voidable at the election of the corporation, that election must be made promptly upon sufficient knowledge of the facts.

Certain persons purchased a parcel of land for the purposes of a rural cemetery, which was deeded to them jointly. They commenced the improvement of the land for the intended use, expending their own means in the work; subsequently the associates organized a corporation

under the act providing for the incorporation of rural cemetery associations (Chap. 133, Laws of 1847), of which they were the only stockholders, and in which they were alone interested. To this corporation they transferred the property, fixing the consideration at $30,000, which was to be paid by the issue of corporate bonds; these by their terms were to be paid out of the net receipts from the sale of lots. These bonds were issued and were all, except those held by themselves, bought in by two of the associates who were directors of the corporation, at less than par. In an action brought by the holder of said bonds for an accounting, etc., evidence was given that the land conveyed was not worth the sum secured. *Held,* immaterial; that while the technical form of the transaction was a sale, it was in substance simply a change in the manner of holding, and no doctrine as to the dealing of a fiduciary agent with the property of his principal had any application thereto, nor did it prevent the purchase by the two associates of the bonds at less than par and the enforcement thereof for the full amount.

The agreement for the purchase preceded by a day or two the actual filing of the corporate certificate. It appeared, however, that the corporation accepted the deeds, took possession of the property, sold off lots, and for more than thirty years has kept the property and its proceeds. *Held,* that the contract was ratified and any defect in its execution was cured.

Some of the bonds devoted seventy-five per cent of the net proceeds of sales made after the first two years to the payment thereof. *Held,* that this did not invalidate the bonds; that the provisions of the act of 1853 amending the act of 1847 (Chap. 122, Laws of 1853), which allows an appropriation of but fifty per cent, related only to the purchase of the land, while here the purchase covered not only the land but the improvements made thereon; also, that if there was any irregularity it was cured by the subsequent amendatory acts (Chap. 163, Laws of 1860; chap. 433, Laws of 1884).

Said purchase was made in 1873; in 1880 the corporation by various acts recognized and ratified the title of the vendees or their successors in interest, making payments to them and providing for future payments. *Held,* that it could not thereafter repudiate the purchase.

(Argued December 4, 1894; decided January 15, 1895.)

APPEAL from judgment of the General Term of the Supreme Court in the fourth judicial department, entered upon an order made July 23, 1892, which affirmed an interlocutory judgment in favor of plaintiff entered upon the report of a referee.

This was an action for an accounting.

The facts, so far as material, are stated in the opinion.

*A. D. Wales* for appellants.   The plaintiff cannot maintain an action against the cemetery upon these bonds.   Hotchkiss and Seymour having obtained possession of the bonds while they were acting as trustees of the cemetery, while they stood in a fiduciary relation to it, their possession and their interest, to which alone plaintiff succeeds, became the possession and interest of the cemetery, and the plaintiff could only maintain an action for an accounting, in which she might charge the cemetery with the actual cost to Hotchkiss and Seymour of the bonds.   (*Torrey* v. *Bank of Orleans,* 9 Paige, 649 ; 7 Hill, 260 ; *Bridenbecker* v. *Lowell,* 32 Barb. 9 ; *Dobson* v. *Racey,* 3 Sandf. Ch. 60 ; *Moore* v. *Moore,* 1 Seld. 256 ; *Darcey* v. *Hall,* 1 Vern. 49 ; *Ex parte Lacey,* 6 Vesey, 625 ; *Monet* v. *Paske,* 2 Atk. 52 ; *Carter* v. *Horne,* 1 Eq. C. Abr. 7 ; 2 DeG. & J. 327 ; 5 Lawson on Rights, Rem. & Pr. § 2392 ; *McDonald* v. *Haughton,* 30 N. C. 393.)   Plaintiff failed to prove title to the bonds.   (*Doubleday* v. *Kress,* 50 N. Y. 410 ; *Wardrop* v. *Dunlop,* 1 Hun, 325 ; 59 N. Y. 634 ; *Brown* v. *Taylor,* 32 Gratt. 135 ; *Mills* v. *Husson,* 45 N. Y. S. R. 802.)   The bonds were void, being issued in violation of the letter and spirit of the charter of the  cemetery association.   (Cemetery Law, chap. 133 of the Laws of 1847, as amended by chap. 122 of the Laws of 1853, and chap. 163 of the Laws of 1860 ; *Lowey* v. *Granite State,* 59 N. Y. S. R. 246 ; *Burger* v. *Koelsch,* 59 id. 69 ; *F. & M. Bank* v. *B. & D. Bank,* 15 N. Y. 128 ; *Crocker* v. *Whitney,* 71 id. 161 ; *Bissell* v. *M. S., etc., R. Co.,* 22 id. 260 ; *Miller* v. *Ins. Co.,* 92 Tenn. 167 ; *Coleman* v. *E. C. R. Co.,* 10 Beav. 1 ; *Steele* v. *Harmer,* 14 M. & W. 830 ; *People* v. *U. Ins. Co.,* 15 Johns. 358 ; *Bell* v. *Leggett,* 7 N. Y. 176 ; *Linkauf* v. *Lombard,* 137 id. 417 ; *Patterson* v. *Patterson,* 59 id. 585.)   The bonds were void as against public policy because they are part of a transaction between the trustees of the corporation as trustees and themselves as individuals.   (*Copeland* v. *J. M. Co.,* 47 Hun, 236 ; *M. R. R. Co.* v. *M. E. R. R. Co.,* 11 Daly, 492 ; 1 Story Eq. Juris. §§ 260, 296, 315–323 ; *Torrey* v. *Bank of Orleans,* 9 Paige, 663 ; *Bliss* v. *Matteson,* 45 N. Y. 22 ; *Gray* v. *Hook,* 4 id. 449 :

*Arnot* v. *P. & E. C. Co.*, 68 id. 558; Chitty on Cont. 571; *Munson* v. *S. G. & C. R. R. Co.*, 103 N. Y. 74; *Gray* v. *Hook*, 5 id. 459; *S. C. Bank* v. *Lamb*, 26 Barb. 601; *Schermerhorn* v. *Talman*, 14 N. Y. 141; *Solinger* v. *Earle*, 82 id. 397; *Knowlton* v. *C. & E. S. Co.*, 57 id. 529, 530; *Keene* v. *Kent*, 4 N. Y. S. R. 532, 533; *Rose* v. *Truax*, 21 Barb. 361; *Woodworth* v. *Bennett*, 43 N. Y. 278; *Dunning* v. *N. Y., H. & N. R. R. Co.*, 84 id. 190.) The defendant is not obliged to restore the land to take advantage of this defense. (*Bank of Salina* v. *Alvord*, 31 N. Y. 476; *Baker* v. *Zeigler*, 31 N. Y. S. R. 466; *Gould* v. *C. C. N. Bank*, 99 N. Y. 333; 86 id. 84; *Whitney* v. *Allaire*, 4 Den. 554; *Cohn* v. *Ellis*, 16 Abb. [N. C.] 321; *Nellis* v. *Clark*, 20 Wend. 24; 4 Hill, 435, 436; *N. Y. S. L. & T. Co.* v. *Helmer*, 77 N. Y. 64; *Barton* v. *P. J. & U. F. P. R. Co.*, 17 Barb. 397; *Rose* v. *Truax*, 21 id. 361; *Materne* v. *Horwitz*, 18 J. & S. 43; *Nelson* v. *Mayor, etc.*, 23 N. Y. S. R. 521; *Leonard* v. *Poole*, 23 J. & S. 213; *Schermerhorn* v. *Talman*, 14 N. Y. 141; *M. E. R. R. Co.* v. *M. R. R. Co.*, 14 Abb. [N. C.] 224, 225.) These bonds were incapable of ratification, and, independent of every question of the manner or machinery of ratification, it was beyond the power of the corporation to ratify them. (*Gray* v. *Hook*, 4 N. P. 449; *Weismer* v. *Village of Douglas*, 64 N. Y. 91; *Hills* v. *P. S. Bank*, 26 Hun, 165; *Woodworth* v. *Bennett*, 43 N. Y. 278; *Meyer* v. *S. I. R. Co.*, 7 N. Y. S. R. 245.) The corporation never has had any trustees legally competent to ratify these bonds, whether they be considered void or voidable. (*Marsh* v *F. Co.*, 10 Wall. 677; *State* v. *Hays*, 52 Mo. 578.) The trustees claiming to have ratified these bonds were ignorant both as to the facts and the law touching their invalidity and could not ratify them. (*Marsh* v. *F. Co.*, 10 Wall. 677; *State* v. *Hays*, 52 Mo. 578; *State* v. *Bank*, 45 id. 528.) The bonds were never issued by the cemetery. (*D'arcy* v. *T. K. H. & C. R. Co.*, L. R. [2 Ex.] 158; *Constant* v. *St. Albans Church*, 4 Daly, 305; *United B. Church* v. *Vandusen*, 37 Wis. 54; *Banks* v. *N. Y. Club*, 68 Hun, 92; *Ryder* v. *B.*

*R. R. Co.*, 45 N. Y. S. R. 388.) The judgment in the case of the *Spring Forest Cemetery* v. *Martha E. Seymour and Others*, was not a bar, and the decision of the referee to that effect and its introduction in evidence were erroneous. (*Springer* v. *Bien*, 128 N. Y. 99; *Krekeler* v. *Ritter*, 62 id. 372; *Shaw* v. *Broadbent*, 129 id. 114; *R. P. Co.* v. *O'Dougherty*, 81 id. 475; *People* v. *Johnson*, 38 id. 63; *Smith* v. *Smith*, 79 id. 634; *Marsh* v. *Marston*, 50 J. & S. 187; *Miller* v. *Manice*, 6 Hill, 114; *Slauson* v. *Englehart*, 34 Barb. 198; *Jordan* v. *Van Epps*, 85 N. Y. 436; *Webb* v. *Berkalew*, 80 id. 560; *Canhopie* v. *P. D. & Co.*, 46 Hun, 306; 79 N. Y. 88; 53 id. 624; *M. C. Co.* v. *Abbey*, 52 J. & S. 97; *Belden* v. *State*, 103 N. Y. 1; *Douglass* v. *Ireland*, 73 id. 107; *Palmer* v. *Hussey*, 87 id. 303; *Lorillard* v. *Clyde*, 99 id. 196.) The resolution of July 13, 1890, did not constitute an account stated, and the referee's finding to that effect was error. (*Dunbar* v. *Johnson*, 108 Mass. 519; *Keane* v. *Branden*, 12 La. 20; *Thomas* v. *Hawkes*, 8 M. & W. 140; *Cocking* v. *Ward*, 1 C. B. 858; *Kennedy* v. *Broun*, 13 C. B. [N. S.] 677; *Mostyn* v. *Mostyn*, 39 L. J. Ch. 780.) The referee erred .in holding as he did that it was possible for plaintiff to recover in this action against the individual defendants. (*Branch* v. *Roberts*, 50 Barb. 435; *Belknap* v. *N. A. L. Ins. Co.*, 11 Hun, 282; *Cole* v. *K. L. Ins. Co.*, 23 id. 255; 91 N. Y. 641; *Paulsen* v. *Van Steenbergh*, 65 How. Pr. 342; *Bewley* v. *E. L. Ins. Society*, 61 id. 344; *Compton* v. *Hughes*, 38 Hun, 380.) The judgment for $1,445.83 costs against the individual defendants, given by the interlocutory judgment, and the judgment in the General Term for $169.45 costs against the same defendants, are erroneous. (Code Civ. Pro. §§ 3230, 3232.) The reference was to hear and determine all the issues involved, and the partial decision of the referee, after all the evidence was before him, was erroneous. (Code Civ. Pro. §§ 1013, 1025; *Garczynski* v. *Russell*, 75 Hun, 492.) There is no basis for a recovery of any kind in this case. (*Pearce* v. *M. & I. R. R. Co.*, 21 How. Pr. [U. S.] 441; *McGregor* v. *D. & D. R. Co.*, 16 L. & Eq. 180 [18

Q. B. 618]; Field's Ultra Vires, 63; *Bissell* v. *M. S. & N. I. R. R. Co.*, 22 N. Y. 262.)

*Edward K. Clark* for respondent. The judgment in *The Spring Forest Cemetery Association* v. *Martha E. Seymour and Others* was properly received in evidence. (*Lorillard* v. *Clyde*, 122 N. Y. 47; *Hughes* v. *U. P. Lines*, 119 id. 423; *Brown* v. *Klock*, 117 id. 342; *Foote* v. *Beecher*, 78 id. 158.) The bonds which are the subject of this litigation are each and all legal obligations. (*Curtis* v. *Leavitt*, 15 N. Y. 9; *Smith* v. *Law*, 21 id. 279; *Hoyt* v. *Thompson*, 5 id. 335; Abbott's Tr. Ev. [2d ed.] 36; *Lovett* v. *S. S. M. Assn.*, 6 Paige, 60; *Trustees, etc.*, v. *McKechnie*, 90 N. Y. 619; *P. Bank* v. *S. A. R. C. Church*, 109 id. 525; *S. N. Co.* v. *Weed*, 17 Barb. 378; *W. A. Co.* v. *Barlow*, 53 N. Y. 70; *Bissell* v. *M. S. & N. I. R. R. Co.*, 22 id. 269; *Palmer* v. *Lawrence*, 3 Sandf. 161; *Curtis* v. *Leavitt*, 15 N. Y. 106; *R. L. R. Co.* v. *Roach*, 97 id. 381; *Woodruff* v. *E. R. R. Co.*, 93 id. 619; *S. H. B. Co.* v. *E. H. B. M. Co.*, 90 id. 616; *Barr* v. *N. Y., L. E. & W. R. R. Co.*, 125 id. 263.) The bonds are valid as to all their terms, including the contract to pay seventy-five per cent of the receipts as the original agreement provided. (*Lorillard* v. *Clyde*, 86 N. Y. 388; *Washburn* v. *Franklin*, 13 Abb. Pr. 140; 35 Barb. 599; *Calhoun* v. *Millard*, 121 N. Y. 83; *Rogers* v. *Stephens*, 86 id. 623; *Barr* v. *N. Y., L. E. & W. R. R. Co.*, 125 id. 271; *In re Straut*, 126 id. 214; *Weed* v. *L. F., etc., Co.*, 31 Minn. 154.) The title to the bonds was sufficiently proved to be in the plaintiff. (*Freund* v. *I. & T. N. Bank*, 76 N. Y. 352; 12 Hun, 541; *Runyan* v. *Mersereau*, 11 Johns. 534; *Prescott* v. *Hull*, 17 id. 292; *Merritt* v. *Cole*, 14 Hun, 325; *Ridden* v. *Thrall*, 125 N. Y. 577; *Cutting* v. *Dameral*, 88 id. 414.) No point is made that plaintiff should have sued in a representative capacity. Such an objection, had it been made, and deemed of importance, could have been obviated by amendment at the outset. (*Stillwell* v. *Carpenter*, 62 N. Y. 639; *Brown* v. *Knapp*, 79 id. 143; *Nanz* v. *Oakley*, 122 id. 631;

*People* v. *Judges*, 9 Wend. 491; *Ketchum* v. *Ketchum*, 4 Cow. 89; *Blood* v. *Kane*, 130 N. Y. 514; *D., L. & W. R. R. Co.* v. *Gilbert*, 44 Hun, 201; 112 N. Y. 673; *Thompson* v. *Whitmarsh*, 100 id. 35; *Buckland* v. *Gallup*, 105 id. 453; *Bingham* v. *M. N. Bank*, 112 id. 661; *Hudson* v. *Reeve*, 1 Barb. 89.) This action not only sought a recovery of money, and of necessity an accounting, but asked relief to the extent of making the defendant trustees personally liable. Such relief should have been given. (Laws of 1860, chap. 163.) No objection was made to the taxation of costs in the interlocutory judgment. Had the objection been made that the taxation was premature, plaintiff might have been willing to wait. (*Oesterreicher* v. *Jones*, 45 Hun, 246.)

FINCH, J. This appeal is from a final judgment rendered upon an accounting which ascertained the amount payable upon bonds held by the plaintiff and issued by the defendant corporation. Necessarily the main questions involved are as to the legality of that issue and the right of the plaintiff to hold and enforce the obligations upon which she sues; and these questions arise out of a situation about which there is little, if any, dispute.

Eleven citizens of Binghamton became the owners of about thirty acres of land, which they bought for the purposes of a rural cemetery. Hotchkiss and Seymour, lawyers of standing and reputation in the city, owned an undivided tenth of the property, and each of the remaining nine of the associates a similar share. They entered at once upon the work of improving the land and preparing it for the intended use, and expended more or less of their own means upon it, looking forward to reimbursement and reasonable profit from the future sale of burial lots. As time passed it became apparent that some change of the situation was imperatively needed. That every sale of a lot should require the signature of each of the eleven and of their wives was a serious inconvenience, and one likely to be greatly increased if any of the associates should die leaving infant children to inherit. Good sense and

sound business policy dictated that the tenancy in common of
the individuals should be transformed into the single title of
a corporation, and that change was effected. The asso-
ciates conveyed to the newly-created corporation, of which
they were the sole stockholders and in which they were the
only persons interested. They fixed the consideration of the
transfer at thirty thousand dollars, to be paid by the
issue of corporate bonds to that amount, one-tenth of which
was to be allotted to each of the original shares. Twenty-one
thousand dollars in amount of such bonds was issued, and the
securities delivered to the proper owners, and those bonds are
still outstanding. While the technical form of this trans-
action was a sale by the eleven to the corporation, its sub-
stance was merely a change in the manner of holding. The
sellers were the buyers. They sold as individuals and bought
as a corporation, and no one else had any interest in the ques-
tion of price or terms of sale. If they were the vendors on
the one hand, dealing with themselves in a corporate capacity
on the other, they were also the sole beneficiaries to be affected
and could not defraud themselves. The abstraction of the
corporate entity should never be allowed to bar out and per-
vert the real and obvious truth. As beneficiaries, the stock-
holders necessarily assented to all the details of the arrange-
ment, and no just criticism is possible either upon the legality
or morality of the transaction. Evidence was given to show
that the land conveyed was not worth the sum secured, but
that is a totally immaterial fact. Whatever the price it
wronged no one and could wrong no one, and accomplished
nothing except to fix a primary limit to the anticipated profits.
It was immaterial for another reason. The bonds were pay-
able wholly out of the enterprise. First fifty per cent and
then seventy-five per cent of the company's receipts from
sales of lots was to be applied on the bonds, and they were
payable from no other source. If the price nominally fixed
had been three times as great, its real product would have
remained the same, for either as bondholders or as stockhold-
ers the whole proceeds above expenses would become theirs

and no more.  It was the enterprise that was debtor, which could only pay by a liberal improvement and maintenance, and the actual price was the amount of its net surplus above expenditure, payable to the associates in the capacity of bondholders at least; a price to which they were fully entitled and which represented the profits they might justly claim to reap. No doctrine as to the dealing of a fiduciary agent with the property of his principal has any application to such a transfer as was made.

There were some alleged technical irregularities in the issue of the bonds.  These represented the purchase price of the land which the corporation bought and kept, and were its promise to pay which it could not justly repudiate.  That kind of plunder which holds on to the property but pleads the doctrine of *ultra vires* against the obligation to pay for it, has no recognition or support in the law of this state. ( *Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62 ; *Duncomb* v. *N. Y., H. & N. R. R. Co.*, 84 id. 199 ; *Woodruff* v. *Erie R. Co.*, 93 id. 619.)  That no formal resolution of purchase was produced from the minutes of the corporation does not prove that there was none, and if, in fact, there was none, because the agreement to that effect preceded by a day or two the actual filing of the corporate certificate, at least the corporation ratified the proposed contract, for it accepted the deeds, took possession of the property, has sold it in burial lots, has kept it and its proceeds for more than thirty years, and put utterly out of its power by its own acts any possible restoration.  It must, therefore, pay or its possession becomes a robbery.

Some complaint is made of the form of the bonds.  They devoted to the purpose of payment fifty per cent of the corporate receipts, and some of them, at least, seventy-five per cent after the first two years.  The act of 1853 (Chap. 122), allowing an appropriation of fifty per cent, relates only to the purchase of the land.  It recognizes that the remainder may go to the expense of needed improvements fitting the property for its intended purposes.  Here the purchase covered

both the land itself and the improvements already put upon it fitting it for use as a cemetery. In 1860 (Chap. 163) such associations were authorized to fund any debt for purchases of land, or the improvement and embellishment thereof, without restriction as to application of income, and, by the act of 1884 (Chap. 433), all sealed certificates issued prior to 1860 were made as valid and effectual as if issued thereafter. The purpose seems to have been to cure any existing irregularity growing out of the prior provisions as to the application of proceeds. I do not think the restriction of fifty per cent applied to these bonds, and, if it did, they have been sufficiently validated both by the act of 1884 and by the long-continued recognition of the corporation.

There can be no reasonable doubt, therefore, that the bonds issued were valid corporate obligations in the hands of the original holders, who were at liberty to enforce them, and had full power and authority to transfer them. They were so transferred. The findings show that Hotchkiss and Seymour bought them all some time before 1873, and probably before the spring of 1871, and were the owners thereof at the death of Seymour, which occurred in January of the latter year. Whatever of criticism there may be upon the proof of this fact, there was enough in the evidence to warrant the referee's finding. Indeed, the corporation itself, in a formal resolution passed in 1880, recognized that ownership and stated an account of moneys received by the holders applicable upon the bonds.

But the further claim is made that, because Hotchkiss and Seymour were officers of the corporation, holding a fiduciary relation as trustees or directors, they could not lawfully buy the valid and outstanding obligations of the company at less than par and enforce them for the full amount against the debtors. If that be sound doctrine, as is stoutly maintained, if directors cannot in any case invest in the bonds of their own companies except at the peril of a constructive fraud, if they cannot safely buy such bonds below par, because they deem them unduly depressed, if titles to corporate obligations

passing through their hands become tainted by their touch, it is quite time that the courts should give, what they have not given, a very definite and distinct warning. Some citations of seeming authority are pressed upon us and others exist. The broad rule is stated in Perry on Trusts, (§ 428), that "a trustee, executor or assignee cannot buy up a debt or incumbrance to which the trust estate is liable for less than is actually due thereon, and make a profit to himself," and that is the doctrine invoked in this case as applicable to a director regarded as a trustee of the corporation. But the statement, however correct in its application to specific instances, must be taken with the limitations which belong to it. Its foundation is that a fiduciary agent, owing a duty to his principal, cannot make a contract for his own benefit which is or may be inconsistent with that duty, and the cases generally are of two kinds. The trustee buys in the property of his principal at a sacrifice for his own benefit, when, if he bought it at all, it was his duty to do it for his principal, or he makes a contract in behalf of his principal with himself directly or indirectly as the other party to the agreement. The first class of cases is illustrated by *Slade* v. *Van Vechten* (11 Paige, 26), where the assignee bought in assigned property at a sheriff's sale and claimed the personal benefit of his bargain ; and the second class by *Munson* v. *S. G. & C. R. R. Co.* (103 N. Y. 58), in which the directors contracting had a private and personal interest, possibly adverse to their fiduciary duty. Almost, if not quite all, of the cases cited by the learned counsel for the appellant belong to one or the other of these two classes. But they do not decide this case, for Hotchkiss and Seymour neither bought in any property of the company nor dealt with the corporation in any respect. They made their contract, not with it, but with third persons capable of protecting their own rights, and bought nothing which the corporation owned or to which it had a right. We must go to still other cases, founded it may be to some extent upon similar ideas of fiduciary duty, to discover even an approximate authority. There are cases of co-partnership in which the general rules pertain-

ing to that specific relation might prove to be broad enough to cover the purchase of the debt owing by the firm, (*Am. Bk. Note Co.* v. *Edson*, 56 Barb. 89), and other cases in which the duties flowing from a liquidation conducted by the trustee, and as to which he owes a specific trust duty, forbid a purchase by the trustee for his own benefit at a discount. But in every class of cases the rule is founded upon the unwillingness of the law to uphold contracts which bring into collision the trust duty and the personal interest, and it is because of that collision, and the temptations which surround it, that it declares the contract voidable at the election of the beneficiary without investigating the good or bad faith of the trustee. The entire basis of the rule consists in this collision between trust duty and personal interest, and the equitable prohibition has no application where there is no such possible inconsistency. There is no such conflict in the ordinary case of the purchase by a director in a going corporation of its outstanding obligations. There is no present duty resting upon him to extinguish them. The time for that has not come, the duty has not arisen, may never arise, the corporation is not prepared to pay, does not contemplate paying, but intends and expects to await the full maturity of the debt. Unless some special fund has been provided, or some special liquidation has been ordered, the director owes no duty to his company to discharge or buy in the outstanding bonds, and may purchase for himself because no inconsistent trust duty has arisen. Why should he not? While the bonds are running to their maturity, and the corporation is not able to extinguish them, is not bound to do so, does not even wish or seek to do so, what does it matter who holds the securities or on what terms they pass from hand to hand? It seems to me that we are asked to crowd the rule almost to the verge of an absurdity, and to inflict a vital injury upon business interests by tainting with invalidity the holding by a director of the unmatured obligations of the corporation bought by him in the open market and not put in liquidation or sought to be extinguished. There must at least be some fact or cir-

cumstance which charges the trustee with a present duty to act for his company in respect to the bonds, which duty is or may be inconsistent with a personal purchase. ·No such duty rested upon Hotchkiss and Seymour, and they had a right to buy and hold for their own benefit.

Indeed, there is a further and equally conclusive answer. If the doctrine invoked applied to this case it would make the purchase not void but voidable at the election of the corporation, and that election must be made promptly and upon sufficient knowledge of the facts. The beneficiary cannot wait and speculate upon the chances of delay, but must act. Here the purchase was made before 1873, and in 1880 the corporation is found recognizing and ratifying the title of the vendees or their successors, making payments to them, and providing for future payments, and it is only after a delay of fifteen years that an attempt to repudiate the purchase is made. I know it is said that there were irregularities and omissions in the due election of trustees, and that such had occurred is indicated by the act of 1860 (Chap. 323), which validates the acts of the trustees notwithstanding a failure to elect annually. But there was an election in 1879 at which lot owners voted, and nine trustees were elected. The criticism is that the administrator of Hotchkiss illegally voted at that election. However that may be, the persons chosen became *de facto* trustees. Both Hotchkiss and Seymour were dead, and the new board contained no representatives of either. It was competent to act and must be presumed to have acted honestly in the performance of its duties. But in 1883 a board was elected without the votes represented by the bonds, and no action of any kind repudiating the bonds or the settlement made was thereupon taken. It is too late now to question the titles of the trustees.

Another thing is said, however. We are asked to presume that Hotchkiss and Seymour bought these bonds with the funds of the corporation, and so they were paid and discharged. There is no basis for any such inference. On the contrary,

the bonds of. Doubleday were transferred in payment of legal services rendered by the transferees. Some of the Martin Stone bonds were assigned to Hotchkiss and Seymour by name, and there is just ground for believing that prior to 1871 the corporation had no money not annually absorbed by the expenses of maintenance and improvement. For at least fifteen years no claim of the corporation adverse to the rightful ownership of Hotchkiss and Seymour appears to have been made, and now, when they and almost all the original associates are dead and cannot speak, no such presumption as is urged upon us can be indulged, especially since it requires us to presume conduct both dishonest and dishonorable.

Very much of argument has been expended upon the admissibility of the judgment in a prior action between the cemetery corporation as plaintiff and Mrs. Seymour and her children as defendants. The case here does not rest or depend upon that judgment, but is sufficiently made without it. I think the judgment was competent evidence, but may be disregarded without at all changing the right of the plaintiff to the relief awarded by the interlocutory judgment. The record introduced, at least, conclusively shows that the corporation at no time since 1853 lost its corporate life by any errors or irregularities in the election of trustees.

The question of costs was not raised by any adequate objection and was in the discretion of the court.

The judgment should be affirmed, with costs.

All concur, except HAIGHT, J., not sitting.

Judgment affirmed.