ALEXANDRINE HOTEL CO. *v.* WHALING.

1. APPEAL AND ERROR—CROSS-APPEAL—APPELLEES BOUND BY DE-
   CREE.
   Appellees who took no cross-appeal from provisions of decree
   denying them relief are bound by such provisions of the
   decree.

2. EXECUTION—SALE OF MORTGAGED PREMISES TO SATISFY JUDGMENT
   FOR PART OF SECURED DEBT.
   Execution sale of mortgaged premises to satisfy judgment in
   action on one of the bonds secured by the mortgage was
   properly held void under statute (3 Comp. Laws 1929, § 14659).

3. EVIDENCE—JUDICIAL NOTICE—ECONOMIC DEPRESSION—HOTELS.
   The Supreme Court takes judicial notice of the stock market
   crash of 1929, the subsequent economic depression and the
   fact that many operators of hotels and apartment buildings
   became so financially embarrassed that investors therein re-
   ceived little if anything for their investments upon reorganiza-
   tion under the bankruptcy act (11 USCA, § 207).

4. INNKEEPERS—HOTEL DINING ROOM—DISCRETION OF MANAGEMENT.
   Whether or not a hotel with a dining room should continue opera-
   tion thereof at a loss while the hotel was financially embar-
   rassed *held*, a matter for the management's discretion.

5. CORPORATIONS—MINORITY STOCKHOLDERS' SUIT—ACCOUNTING—
   DIRECTORS' PURCHASE OF OUTSTANDING BONDS AT A DISCOUNT.
   In minority stockholders' suit for accounting against directors
   who owned a majority of the stock and who had purchased
   over two-thirds of the outstanding bonds against hotel cor-
   poration at a discount, record *held*, devoid of any showing that
   affairs of the corporation were conducted with the purpose of
   benefiting the defendants.

6. SAME—DIRECTORS' PURCHASE OF OUTSTANDING BONDS AT DIS-
COUNT.

A director or other officer of a corporation may rightfully pur-
chase a bona fide outstanding claim against the corporation
at a discount and collect in full from the corporation provided
he is under no present duty to act in the transaction for the
corporation and the rights of other creditors are not involved
and prejudiced thereby.

7. SAME—DIRECTORS' PURCHASE OF STOCK—EQUITY.

No trust duty rests upon the directors, officers, majority stock-
holders, or liquidators of a corporation in behalf of any other
stockholders or set of stockholders with respect to dealings
between them in buying or selling stock in the corporation,
unless some situation exists which makes it inequitable for
such officer to buy the stock in question.

8. SAME—DIRECTORS' PURCHASE OF OUTSTANDING BONDS AT DIS-
COUNT—REDEMPTION AT FACE VALUE.

Directors' purchases of outstanding corporate bonds at a dis-
count while hotel which corporation owned was solvent but in
a distressed financial condition during depression but which
bonds were later paid in full when corporation was no longer
distressed for ready cash does not require that such directors
be limited to recovery of amount paid for bonds.

Appeal from Wayne; Murphy (George B.), J.
Submitted June 6, 1945. (Docket No. 4, Calendar
No. 42,641.) Decided December 3, 1945.

Bill by Alexandrine Hotel Company, a Michigan
corporation, against Montgomery Whaling and
others to compel conveyance of real estate, that
plaintiff is not indebted to defendants and for re-
turn of money. Meyer Ostrow intervened as party
plaintiff. Decree for defendants. Plaintiffs appeal.
Affirmed.

*John P. O'Hara, John F. Wagner* and *Edgar M.
Branigin* (*Bert D. Chandler*, of counsel), for plain-
tiffs.

*Fred G. Dewey* and *Frederick G. Dewey,* for defendants.

*Charles S. Porritt, amicus curiae.*

REID, J.   Plaintiffs' bill of complaint prays for an accounting between plaintiffs and defendants Whaling and Goodspeed, hereinafter referred to as the defendants; further, that defendant Uridge be decreed to have no right or title to the real estate of plaintiff Alexandrine Hotel Company under a sheriff's deed, and for other relief.

Plaintiffs further seek the appointment of a receiver for plaintiff hotel company, and a determination of the rights of defendants in regard to certain bonds and stock of the plaintiff hotel company.

Prominent place in the briefs filed is given to the rights of defendants, while managing the business of plaintiff company, to buy its bonds and hold them at face value, especially in view of the distressed situation of the company.   Also prominent in the briefs is the discussion of commissions retained by defendants for compensation for management of the hotel.

Defendants claim that their purchase of stock was not forbidden to them as managers of the company's business; that they commenced purchasing bonds at a time when it appeared that bondholders might take some action prejudicial to the company's interest; and that defendants' ownership of a considerable amount of bonds resulted in the subsequent "reorganization" being more advantageous to the company than it would otherwise have been. Defendants further claim that the corporations underwriting the bond issue agreed that the plaintiff corporation might retain 3 per cent. of the total gross income as compensation for management, and

defendants claim that it was proper for them, as actual managers, to retain the 3 per cent., and that $1,800 is due them on that account.

The decree was for defendants. Plaintiffs appeal. Defendants took no cross appeal and are therefore bound by the provisions of the decree which allowed nothing to defendants as balance due them for management, and, also, cancelled the title of defendant Uridge to the hotel real estate without reimbursement to defendants, who advanced the money to purchase the title in the name of Uridge. However, plaintiffs claim that the matter of the Uridge title, herein called the Starr-Robbins matter, is important to show bad faith and designing practices on the part of defendants in their various activities respecting the company's affairs.

The Starr-Robbins matter relates to a suit against the company in which a $1,000 bond of the 1930 issue was reduced to judgment. Levy was made on the hotel property and execution sale occurred. Defendants neglected to pay the judgment. After the sale had nominally become absolute, defendants bought the Starr-Robbins title for $7,500, taking the title in the name of defendant Uridge. Defendants then sought to have the stock issue reorganized, the value of the shares put at $.25 each, and their $7,500 repaid to them by issue of capital stock at $.25 a share. If this proposal had been accepted, defendants would have had control of the company. Defendants claim that the Starr-Robbins matter showed their willingness to safeguard the interests of the company by investing the $7,500. The sale was held void under 3 Comp. Laws 1929, § 14659 (Stat. Ann. §.27.1623).

The facts about the organization and financial history of the Alexandrine Hotel Company are in general but little disputed. Originally there were

two separate but connected hotels, upon separately-owned but contiguous parcels of land situated at 70 West Alexandrine avenue in Detroit, which hotels were built in 1924 and 1925, at a cost of about $1,600,000. The properties were encumbered by first trust mortgages of about $950,000, and there were second mortgages and other liens. In 1930 a reorganization was effectuated, and the present plaintiff corporation, Alexandrine Hotel Company, became the owner of both properties. The former bondholders surrendered their bonds for stock in the new corporation and the two hotels became known under the name "Strathmore." After the reorganization, the new corporation, having paid a large amount of its obligations, including taxes and other liens, began with an outstanding bonded indebtedness of $180,000, secured by first mortgage.

Defendant Whaling had retired from some of his previous business matters, which had consisted principally of selling steel, but he had had no previous experience in operating hotels. Shortly after the reorganization, he became president of the corporation, having received 3,001 shares of stock, for which he had surrendered bonds that he had previously held. At that time there were outstanding 93,733 nonpar shares of common stock. Defendant Whaling did not become a resident of the city of Detroit and was accustomed to spend his winters in North Carolina, where he owned a residence, staying from fall until April or May in each year. While he was in North Carolina, he kept in close touch by mail and telephone with the employees of the hotel, noted the bills and signed the checks. Whaling testified,

"I have kept my hand on everything that hotel has done during that period."

Whaling continued as president of the corporation from the time of the reorganization until the time of the hearing with the exception of the period, July 29, 1939, to May 22, 1940.

In the latter part of 1931, defendant Goodspeed, a Grand Rapids banker who for some years had been associated in different business ventures with defendant Whaling, purchased some stock in the Alexandrine Hotel Company and in 1932 was elected director. Goodspeed is connected with the Morton and Pantlind hotels in Grand Rapids and at the time of the hearing was in principal control of the management of the Pantlind hotel. He continued his activities as a banker in Grand Rapids, sometimes visited Detroit, and often stayed at the hotel in question. He remained a director to the time of the hearing, with the exception of the same corporate year in which defendant Whaling was out of office as president.

Eugene W. Lewis of the Industrial National Bank in Detroit, who received 9,008 shares of stock in exchange for his bonds on the reorganization of 1930, was a director through all of the time of the management by defendants and until the annual meeting in May, 1940. Defendants Whaling and Goodspeed together with Mr. Lewis had control of the management of the corporation from 1932 to July 27, 1939.

Defendants paid an average of 52.67 per cent. of face value for the bonds purchased by them. Only a small fraction of the bonds held by defendants were purchased by them during the year when they were not in management of the company. At the time of the trial, defendants owned or controlled $91,800 of bonds, out of a total of $130,000, and were then in control of 54,490 shares of stock out of a total issue of 93,733 shares.

When defendant Whaling became president of the plaintiff hotel company in 1931, he employed Harriet Sellner as manager of the hotel. She had been manager for 9 years of the Otsego Hotel in Jackson, which was both a commercial and residential hotel having 200 rooms. She remained in charge of the management of the plaintiff company's hotel until she was discharged on August 31, 1939.

The hotel had a dining room capable of seating 200 persons opening directly off the lobby, with a kitchen suitable for preparing food for 200 persons. The question is discussed whether it was good judgment to operate this dining room, which did not directly show a profit but much of the time showed a loss. Plaintiffs claim that other residential hotels in Detroit did not operate their own dining rooms at the period from January, 1931, to July, 1939, and further claim that in that period defendants did not cause any expert on hotel affairs to make a survey of the situation of this hotel and recommend operational changes to reduce losses. We consider that the question of the operation of the dining room was a matter for the management's discretion; doubtless many patrons would require some dining-room service in the building.

The trial court found:

"The court takes judicial notice of the great stock market crash of 1929, and the subsequent devastating results to our economic structure, resulting in wholesale financial upheaval, bankruptcies and disturbances following in its wake, from 1929 through the bank failures of 1933, with a tapering off in the succeeding years until about 1937, when the economic structure regained, to a large extent, its former normalcy and stability.

"The court further takes judicial notice of the fact that during the years from 1929 to 1937, a large majority of the large hotels, residential and otherwise, and apartment buildings, in Detroit, became so financially embarrassed that many of them were liquidated outright, or sought reorganization under the Federal bankruptcy statute 77-B;[*] that during this crisis, so-called, bondholders 'protective' committees were organized, receivers appointed over the properties in question, and huge sums paid from the corpus by way of cost charges, receivers' and attorneys' fees; that the bonds of these corporations could have been and, in fact, were literally 'picked up' for a few cents on the dollar; that the stockholders got nothing. In the last analysis, countless pieces of highly-improved property, hotels and apartment buildings, were eventually turned over to strangers, for a small fraction of the original investment, and the bondholders, as well as the stockholders, got very little, if anything, for their investment."

We also take judicial notice of the general situation described above. Such matters have been brought to our attention in several appeals.

Under defendants' management the hotel was kept open and while it did not always pay its taxes promptly, it met its general operating expenses. The corporations that underwrote the bond issue knew in great detail the management by defendants, took no steps to terminate such management, and consented to the reorganization of the mortgage in 1937, by which reorganization plaintiff corporation was to retain 3 per cent. commission as compensation for management. It must be inferred that the underwriters were satisfied with defendants as managers. The trial court found that he could not

---

* See 11 USCA, § 207.—REPORTER.

say that other persons could have managed the corporation during the period of defendants' management more efficiently and show a better financial statement at the end of the term.

However, during defendants' management the $180,000 mortgage was seriously in default, requiring that it be reorganized. The hotel continued to operate and although it made no profit the management succeeded in paying operating expenses, including the payroll. Current and accrued obligations increased from $16,876.46 in May, 1931, to $112,067.23 in February, 1934, and continued near or over $120,000 until the reorganization of September, 1937, and beginning at $6,833.47 in September, 1937, ranged from that amount to $16,687.61 in December, 1939.

On September 7, 1937, a new arrangement was made respecting the $180,000 mortgage. One half of the unpaid interest was cancelled, and the other half deferred until June 15, 1946. $6,000 each year was to be paid on the principal in 1937, 1938, 1939 and 1940, and thereafter $10,000 each year until the maturity, June 15, 1946, and the agreement further provided that the net amount of receipts from the operation of the hotel should be paid to the Detroit Trust Company, trustee under the mortgage, but that plaintiff company should be permitted to retain 3 per cent. of the gross receipts as a management fee or charge. Under the agreement, the trustee was empowered to take charge whenever it considered the mortgage in jeopardy.

The filing of this bill was instigated by Meyer Ostrow, who became a stockholder during 1938 and 1939, and who at the time of the trial owned 1,500 shares of stock, which he acquired in several purchases. Ostrow testified that he deals in unlisted securities, buying them from liquidators of banks,

administrators of estates, or other persons anxious to get rid of securities for which they cannot find a market. He has no office or telephone and keeps no books in his business. Ostrow obtained his first shares of stock of plaintiff corporation in the middle of 1938, taking them in a deal with some other paper. After having made inquiries into the status of the corporation, he got together with some of the stockholders, and proxies from other stockholders were obtained, with the result that at the meeting of July 27, 1939, Eugene Lewis was re-elected director but defendants Whaling and Goodspeed were displaced, and Ostrow, Knight, Thomas Murphy and Harold Murphy were elected directors. Thomas Murphy was elected president and Ostrow became secretary.

The original bill of complaint in this suit was filed October 4, 1939, while Ostrow and his friends were in the management of the corporation. Ostrow removed Miss Sellner from the management of the hotel, and spent most of his time for three months changing the operation of the hotel. Witness Jack Brown testified that Ostrow stated:

"When I take charge of this hotel, everything goes as long as they pay their bills."

Miss Sellner corroborated that witness' testimony as to the character of management, testifying concerning Ostrow:

"He said it wouldn't make any difference as long as they could pay their bills, patrons would be accepted if they could pay."

Defendants claim that while the hotel in question was a residential hotel, Ostrow during his three months of management permitted gamblers to frequent the hotel, and, further, that the character of

certain patrons permitted in the hotel was detrimental to the general patronage and reputation of the hotel. After three months the other directors removed Ostrow from his connection with the management of the hotel.

Upon being thrown out of the management in July, 1939, defendants set about purchasing stock, and at the annual meeting in May, 1940, defendants owned or controlled about 56 per cent. of the shares, and they with Harold Murphy were elected directors. Plaintiff Ostrow was granted leave to intervene in this suit which he and his associates had begun in October, 1939, and on the hearing none of Ostrow's associates were continuing to manifest any ostensible interest in the outcome. After defendants resumed management in May, 1940, they did not cause the resolution authorizing counsel to prosecute this suit to be rescinded and, although managing the corporation at the time of the hearing, they are permitting the substituted attorney, Mr. O'Hara, to prosecute the suit against themselves.

Miss Sellner, who became manager of the hotel in 1931 and was discharged by Ostrow August 31, 1939, was reinstated in her employment June 1, 1940. Her testimony as to the operating expenses and income of the hotel showed that the management was hard pressed to keep the hotel running during the period 1931 to about 1937, but that a profit was shown in 1937 and in general during the years following. There was an operating loss, without taking depreciation into account, of about $27,559.11 in 1932; for 1933, $26,160.46; in 1934, $9,367.07; in 1935, $7,547.88, which, however, took depreciation into account; in 1936 there was a profit of $18,152.99 before depreciation.

Witness Clarence J. Winkler was trust administrative clerk with the Detroit Trust Company. The Detroit & Security Trust Company joined with the Union Trust Company in underwriting the $180,000 bond issue of January, 1930. The change in the name of Detroit & Security Trust Company to Detroit Trust Company, which company carried plaintiff corporation's bank account as the Strathmore hotel trust account, occurred on October 23, 1930. Apparently plaintiff corporation exercised no control over the account after November, 1932, the witness and other officers of the trust company being authorized to draw checks against the account, which account continued to December, 1937. The Detroit Trust Company is also transfer agent of plaintiff corporation and has the records of stock transfers of plaintiff corporation. Mr. Winkler testified,

"After December 15, 1934, $9,000 semiannually or $18,000 per year was required in principal. These maturities were met principal and interest until June 15, 1932, when the first default occurred. Neither principal nor interest were paid. On December 15, 1932, the company again defaulted. The company likewise defaulted on June 15, 1933, as to principal and interest, and on December 15, 1933, and on January 15, 1934, on December 15, 1934, June 15, 1935, December 15, 1935, June 15, 1936, December 15, 1936, June 15, 1937. * * * For a period of 5 straight years, nothing was paid, either upon principal or interest, under the $180,000 mortgage. Taxes unpaid in 1932 were 1930 State and county, amounted to $6,079.83; 1931, city, $16,170.16; and the 1931 State and county, $5,554.60, a total of $27,804.59. In October, 1936, all taxes were paid with the exception of 1931 and 1932 city, State and county taxes, amounting to $29,635.67. They must have been paid by the Detroit Trust Company, because in those years we were getting the income from the property as operating expenses. The cor-

poration managed the * * * (hotel) but turned the net revenue over to us every month. The Detroit Trust Company * * * began to take the net receipts from the hotel operations in November, 1932, or approximately thereabouts, because that's when * * * the corporation appears to have executed an assignment of rents to us in furtherance of the terms of the mortgage. * * * The reorganization supplemental indenture of mortgage was executed as of September 7, 1937, but it dated back to June 15, 1936.''

We have heretofore recited a partial outline of the reorganization, which, however, also included an arrangement for registering the bonds and providing a sinking fund to be used by a trustee to purchase bonds in the open market.

As to the value of the real estate, the bill of complaint filed October 4, 1939, alleges that the hotel property is worth in the neighborhood of $400,000 and upwards, and the same allegation appears in the amended bill, filed April 8, 1941. Defendants deny this allegation.

Witness Winkler testified that the annual balance sheet of the Alexandrine Hotel Company lists the appraisal of the assets for 1931 as $1,074,643.76; for 1932, $1,073,167.07; for 1933, $380,045.60; for 1934, $373,880.94; for 1938, $371,894.73; for 1939, $324,285.56; for 1940, $331,745.48. Witness Edward W. Marquart, a member of a bondholders committee which represented a banking house that underwrote the bond issue of the Strathmore hotel, testified that $380,000 represented the value of the hotel in 1933. Defendant Whaling testified that $350,000 was a fair estimate of the value of the property at the time of the hearing in September, 1941, and that the bonds then outstanding amounted to $128,000 and that therefore the property was worth net $220,000.

Plaintiffs' claim for the value of the hotel real estate is greater than the amounts indicated by the testimony of the witnesses Winkler, Marquart and Whaling. In any case, the value of the real estate under any credible showing in the record was much greater than the total debts of the corporation at any and all times since defendants first had the management of the hotel in 1931 until the taking of the testimony on the trial of this case in circuit court.

The corporation had no funds with which to make purchase of its outstanding bonds and no sinking fund had been accumulated when defendants bought the bonds heretofore spoken of.

The charge of 3 per cent. commission for management was moderate in amount.

The case is devoid of any showing that the defendants conducted the affairs of the corporation in any manner with the purpose of benefiting the defendants. The management was as successful as could well be expected during the hard years of the great depression. The matter of the Starr-Robbins foreclosure decree and deed indicated a particular oversight on the part of the management for which the decree appealed from abundantly punished them.

The supreme court of Missouri in *Punch* v. *Hipolite Co.,* 340 Mo. 53 (100 S. W. [2d] 878), considered a dispute as to the right of management to purchase outstanding bonds and mortgage-secured notes of a corporation whose affairs were in such condition that (p. 63):

"Not only were no payments made to the bank on the principal of the company's notes but it became necessary to call on the bank, from time to time, for further advancements to keep the business going."

At p. 72, the court said,

"The general rule seems to be that directors or other corporate officers may purchase outstanding obligations of the corporation at a discount and collect the full value thereof from the corporation unless (1) he owed a present duty to the corporation to purchase or discharge the claim for the corporation, or (2) the rights of other creditors of the corporation are involved and the question arises between such director or officer and other creditors. In such case he will not be permitted to collect the full value of such claim to the prejudice or disadvantage of other creditors, but will be limited to the amount paid therefor. The matter may be more succinctly stated in this way: A director or other officer of a corporation may rightfully purchase a bona fide outstanding claim against the corporation at a discount and collect in full from the corporation provided he is under no present duty to act in the transaction for the corporation and the rights of other creditors are not involved and prejudiced thereby." (Citing several cases.)

See, also, *Seymour* v. *Spring Forest Cemetery Assn.,* 144 N. Y. 333 (39 N. E. 365, 26 L. R. A. 859); *Glenwood Manufacturing Co.* v. *Syme,* 109 Wis. 355 (85 N. W. 432).

"No trust duty rests upon the directors, officers, majority stockholders, or liquidators of a corporation in behalf of any other stockholders or set of stockholders with respect to dealings between them in buying or selling stock in the corporation, unless some situation exists which makes it inequitable for such officer to buy the stock in question." *Bisbee* v. *Midland Linseed Products Co.,* 19 Fed. (2d) 24, 27.

See, also, *Mairs* v. *Madden,* 307 Mass. 378 (30 N. E. [2d] 242, 132 A. L. R. 256).

While some authorities and cases to somewhat contrary effect are cited by plaintiff, still the above citations set forth the better view of the duty and rights of management, as applied to the facts in the instant case.

The plaintiff corporation was not insolvent at the times that defendants purchased the bonds in any sense that would vitiate such purchases of bonds by the management, nor require that defendants should be limited to recovery of the cash paid therefor.

Defendants made no attempt to enforce payment of the bonds during the period when the corporation was distressed for ready cash, nor is there anything in the record to show that such was defendants' intent. Now that the demand for hotel accommodations has greatly increased in the Detroit area, and the corporation unquestionably is solvent in every sense of the word, there is no good reason for denying defendants' right to the full face value of the bonds.

The decree appealed from set aside and held for naught the levy, sale and deed in the Starr-Robbins matter. Defendants were accorded the right to enforce the bonds they purchased at full face value. Defendants' purchase of stock of the corporation was likewise upheld.

That decree is affirmed, with costs to defendants.

Starr, C. J., and North, Butzel, Bushnell, Sharpe, and Boyles, JJ., concurred. The late Justice Wiest took no part in the decision of this case.