510

CLAUDE NEON LIGHTS, INC., Appellant, *v.* FEDERAL ELECTRIC COMPANY, INC., Appellant; BARNEY JOHNSON, ROSCOE PARKINSON, PURCELL L. SMITH and COMMONWEALTH SUBSIDIARY CORPORATION, Respondents, BARNEY JOHNSON & COMPANY, Additional Defendant, Respondent, and CHARLES BORLAND, Additional Defendant.

First Department, April 9, 1937.

512

*Charles L. Woody* of counsel [*Gifford, Woody, Carter & Hays,* attorneys], for the plaintiff-appellant.

*Harold R. Medina* of counsel [*Alexander C. Dick* and *William Gilbert* with him on the brief; *Dick & Burroughs,* attorneys], for the defendant-appellant, Federal Electric Company, Inc.

*David B. Landis* of counsel [*Ralph F. Huck* with him on the brief; *Chapman, Snider, Duke & Landis,* attorneys], for the respondents Barney Johnson & Company and Barney Johnson individually, and for the respondent Roscoe L. Parkinson.

*H. G. Pickering* of counsel [*E. N. Gadsby* with him on the brief; *Mudge, Stern, Williams & Tucker,* attorneys], for the respondents Purcell L. Smith and Commonwealth Subsidiary Corporation.

*John Godfrey Saxe* of counsel [*William J. O'Shea, Jr.,* with him on the brief; *Saxe, Gerdes, Bacon & O'Shea,* attorneys], for Victor S. Rice, Harry D. Sarver and Mrs. J. H. Goehst, constituting a stockholders' committee of Federal Electric Company, Inc., as *amici curiæ.*

*White & Case* of counsel for William A. Keating, Walton S. Bell and Julian J. Verst, a stockholders' committee, as *amici curiæ.*

MARTIN, P. J. A complete statement of the relationship of the various corporations and parties involved is set forth in the opinion of Mr. Justice McAvoy, and need not be repeated.

The objective of this litigation is to impress a constructive trust upon the sale by the defendant Commonwealth Subsidiary Corporation to defendants Barney Johnson & Company and Roscoe Parkinson of what is called the " portfolio " of the corporate obligations and stock of the defendant Federal Electric Company, Inc. The securities in the so-called portfolio consist of the following:

(a) A seven per cent promissory note of Federal Electric Company, Inc:, to Commonwealth Subsidiary Corporation in the amount of $856,000, maturing January 1, 1941.

(b) A four per cent promissory note of Federal Electric Company, Inc., to Commonwealth Subsidiary Corporation in the amount of $59,920, maturing January 1, 1937.

(c) 3,560 shares of six-dollar prior preferred stock of Federal Electric Company, Inc.

(d) 4,721 shares of seven-dollar preferred stock of Federal Electric Company, Inc.

(e) 12,393 shares of common stock of Federal Electric Company, Inc.

There are separate contracts running to Barney Johnson & Company and Parkinson. Both are dated August 23, 1935. The one between Commonwealth and Barney Johnson & Company covers the sale by Commonwealth to the Johnson Company of the note of Federal in the face amount of $856,000 for $428,000; Commonwealth agreed to deliver 856 notes in the face amount of $1,000 each, and, if unable to make delivery in that form, the Johnson Company had the option of accepting delivery of the single note for $856,000. The contract with Parkinson covered the sale by Commonwealth to Parkinson of the remainder of the portfolio, consisting of the note in the face amount of $59,920 and a total of 20,674 shares of preferred and common stock of Federal for a price of $22,000. This Parkinson contract was conditioned upon the completion of the sale of the $856,000 note to Barney Johnson & Company.

Negotiations for the sale of the portfolio were conducted by a vice-president of Commonwealth Subsidiary Corporation, Purcell L. Smith, acting for his corporation; Barney Johnson, president of the Johnson Company, acting for his corporation, and Parkinson. Smith, in addition to being vice-president of Commonwealth, was a director of the defendant Federal Electric Company, Inc. Parkinson had been a director of Federal.

The claim for relief asserted by defendant Federal Electric Company, Inc., is based on the contention that said directors were under an obligation to offer these securities to the corporation they were serving, having knowledge of that company's purpose, plan and desire to acquire them. The plaintiff's claim for relief is dependent upon the determination of the claim of Federal.

At the beginning of 1935 the obligations of the Federal Electric Company, Inc., were of two classes: (1) Its indebtedness to its bank and trade creditors, amounting, all told, to the sum of $647,000; and (2) its indebtedness to Commonwealth on the two notes then held by Commonwealth, aggregating $915,000.

It was known that Commonwealth was desirous of selling the portfolio and was willing to do so at a substantial discount. The board of directors of the Federal Electric Company, Inc., was not satisfied with the services of Charles Borland, the president of the corporation, and he, for obvious personal reasons, desired that the portfolio be in hands friendly to him. To that end, on March 1, 1935, he obtained an option for the purchase of the portfolio for $500,000. This option he obtained in his own name, but, in reality, it was for the benefit of the plaintiff and not for the benefit of Federal. On April 1, 1935, Borland acknowledged that the negotiations for the purchase of the Commonwealth portfolio

were for the benefit of plaintiff, and that on the board of directors of Federal he was acting for the plaintiff. The option was not exercised and no further proposal was ever submitted to Commonwealth by Borland on behalf of any one.

Efforts were directed toward a settlement with the bank and trade creditors, and on or about August 15, 1935, a settlement at eighty per cent of the face amount of the claims was effected with these creditors.

While the details of this settlement were being worked out, informal discussions were had among the directors of Federal, but no formal meeting of the board was had between March 25 and August 13, 1935. Borland gave testimony to the effect that it was contemplated that, after the settlement with the trade and bank creditors was effected, Federal would undertake to purchase the Commonwealth portfolio. The trial court found and the record establishes that if this was Borland's plan, it was not communicated to any of the other directors.

About July 1, 1935, a representative of Borland's had a conversation with Smith about the Commonwealth portfolio. Smith's testimony as to this is: " He said that he would like to have it understood that we, not defining ' we,' would have first call upon the securities of the Federal Electric Company owned by Commonwealth Subsidiary Corporation. I told him that the answer to that was ' no; ' that we had no commitments and we would make none until a definite plan or a definite purchase or a definite proposal was made to us."

At a later discussion with Borland, Smith informed Borland, in response to the latter's inquiry as to whether Commonwealth had done anything with the Federal securities, that Commonwealth had a negotiation, but it was not known what would come of it.

On July 31, 1935, Parkinson obtained from Commonwealth an authorization (referred to as a " finder's agreement ") to negotiate for the sale of the portfolio for a net cash price to Commonwealth of $450,000. Under it Parkinson was to receive a commission not exceeding five per cent, which was to be added to the $450,000 sale price, and, in addition, he was to receive one-half of any excess realized over the price fixed. This authorization was for the period extending through August fifteenth. It was intentionally kept secret from Borland.

A meeting of the board of directors of Federal was held on August 13, 1935, for the purpose of passing necessary resolutions for the payment of bank and trade creditors. At that meeting there was no discussion with reference to the Commonwealth portfolio.

Parkinson resigned and in his place was elected on August 23, 1935, Bertram L. Trillich, who theretofore had acted as Borland's representative.

Parkinson endeavored, first, to sell the portfolio to Reliance Advertising Company of Cleveland. His efforts in that direction failed. About August fourteenth he obtained an extension of his " finder's agreement " to August 23, 1935. On August fourteenth or fifteenth and after his resignation, he met, for the first time, Barney Johnson, and at this meeting Parkinson told Johnson of the Commonwealth portfolio. Johnson became interested. Parkinson reported Johnson's interest to Smith, and, after investigating the Johnson Company, Commonwealth supplied Johnson with desired information. Smith was advised that the Johnson Company wanted the note split up into 856 $1,000 notes. On August twenty-second Borland was informed that Smith would present, at a meeting of the board of directors of Federal to be held the next day, a resolution authorizing a split-up of the large note into $1,000 notes. At the meeting on the twenty-third a resolution was presented and action thereon was deferred at Borland's request. On that date the contracts for the sale of the portfolio were entered into between Commonwealth and the Johnson Company and Parkinson, the Johnson Company paying $20,000 as earnest money in respect to its contract. A meeting was held on September fourth and then Smith told the board of directors of Federal that Commonwealth had obligated itself to sell the securities and that the resolution for the split-up was wanted in connection with that sale. The resolution was passed, Borland voting in favor of it, but Trillich refrained from voting. The Johnson Company was informed of the action of the board and thereupon offered the notes for sale " when, as and if delivered " and succeeded in selling the notes in a very short period.

A conference was had on September 11, 1935, in the office of the counsel for Federal at which the attorney for Federal stated that it seemed to him that the portfolio was a block of securities that Federal ought to be allowed to acquire if it could and the conference had been called to see if there was any possibility of arriving at that result; Smith stated that he was under a firm commitment to sell the securities, but declined to give the name of the purchaser, but did give the name of the attorney for the purchaser and suggested that the purchaser's name might be obtained from him.

Borland raised the question whether it was necessary to register under the Securities Act of 1933 (U. S. Code, tit. 15, §§ 77-a–77-aa), and instituted litigation in the Federal court in October, 1935, to have that question determined, in aid of the sale.

It is urged on behalf of Federal that when Parkinson ascertained, as a result of his " finder's agreement " of July thirty-first that Federal's securities owned by Commonwealth could be acquired at less than fifty cents on the dollar, it became his duty as a director to inform his company of that fact; that the same obligation rested upon Smith; that it makes no difference whatever what these men knew or did not know in regard to Federal's plan, purpose and desire to acquire the portfolio.   In Fletcher's Cyclopedia of Corporations (Permanent ed. § 869) it is stated that the general rule is that directors or other officers may purchase, and enforce, claims against their corporations, at their face value, notwithstanding they were bought at a discount, provided, however, that (1) if such officer owed the duty to his company to purchase the claim for the company instead of for himself he cannot enforce his claim in excess of what he paid for it, and, according to what is apparently held in a few decisions, that (2) if a corporation is insolvent at the time of the purchase the officer cannot enforce his claim for more than he paid for it.   The rule is reiterated in *Matter of McCrory Stores Corporation* (12 F. Supp. 267), where it is said: " Under ordinary conditions a director may purchase claims against his corporation at a discount and enforce them for their full amount.   (*Seymour* v. *Spring Forest Cemetery Association*, 144 N. Y. 333; 39 N. E. 365; 26 L. R. A. 859; *Glenwood Mfg. Co.* v. *Syme*, 109 Wis. 355; 85 N. W. 432; Fletcher on Corporations, § 2289.)   But the case is different where the corporation is insolvent and is itself in the field to settle the claims.   A director who acquires claims under such circumstances may enforce them for no more than the cost of acquisition."

In 1 White on New York Corporations (Bender ed. p. 304) it is stated: " There is no conflict between trust duty and personal interest in the ordinary case of the purchase by a director in a going corporation of its outstanding, unmatured obligations.   ' There is no present duty resting upon him to extinguish them.   The time for that has not come, the duty has not arisen, may never arise, the corporation is not prepared to pay, does not contemplate paying, but intends and expects to await the full maturity of the debt.   Unless some special fund has been provided, or some special liquidation has been ordered, the director owes no duty to his company to discharge or buy in the outstanding bonds, and may purchase for himself because no inconsistent trust duty has arisen. Why should he not?   While the bonds are running to their maturity, and the corporation is not able to extinguish them, is not bound to do so, does not even wish or seek to do so, what does it matter who holds the securities or on what terms they pass from hand to hand?   It seems to me that we are asked to crowd the rule almost

to the verge of an absurdity, and to inflict a vital injury upon business interests by tainting with invalidity the holding by a director of the unmatured obligations of the corporation bought by him in the open market and not put in liquidation or sought to be extinguished.' *Seymour* v. *Spring Forest Cem. Assn.*, 144 N. Y. 333, 344; 39 N. E. 365; 26 L. R. A. 859 (1895), per FINCH, J."

Under the foregoing authorities and under the circumstances here disclosed Parkinson could have acquired all of the securities in his own name. It was common knowledge that Commonwealth was anxious to sell, and willing to sell at a discount. No one, save Borland and his representative, Trillich, knew of Borland's desire to acquire the securities, and no other person who should have known had been informed of any corporate intent on the part of Federal to acquire the securities.

In addition to this lack of knowledge on the part of everyone, save Borland and Trillich, there is a serious question as to the ability of Federal to finance a purchase. On July 15, 1935, Borland obtained from the Commercial Credit Company a letter offering to purchase acceptable receivables up to a cash line of $550,000, provided the money be used primarily for retiring the securities of the Commonwealth portfolio, the amount to be paid therefor to be between $400,000 and $500,000. This offer was not disclosed to the other directors. The receivables referred to are not the property of Federal, but are the property of its subsidiary, Claude Neon Federal Company, not a party to this litigation. The trial court found that the proposal would so depreciate the working capital of Federal and its subsidiary, Claude Neon Federal, that it would have to be modified so as to provide for a revolving credit. The trial court also found that Federal has not established or provided a fund with which to purchase the Commonwealth portfolio in whole or in part.

Parkinson, under the letters of July thirty-first, did not undertake to purchase the securities for himself. By those letters he obtained authority to act as Commonwealth's agent in procuring a purchaser for the securities. In this connection he was acting as agent for Commonwealth in dealing exclusively with Commonwealth's own property. When he obtained the authority he had a prospect in mind but no definite offer. The eventual purchaser was unknown to him at the time.

It is urged that the ultimate operative fact in this litigation is the secrecy behind and the withholding of information in regard to the letters of July thirty-first; that had Federal been informed on July thirty-first that Commonwealth was then on the verge

of disposing of its holdings, Federal would have purchased; that it was able to act, and it would have acted promptly. The record shows that neither the stockholders nor the directors of Federal ever authorized the purchase of the securities; no proposal to purchase them was ever submitted either to the board of directors or the stockholders; no corporate plan with respect to the securities has ever been formulated, expressed or adopted by the agencies which are legally capable of doing so. The fact is that Borland, and Borland alone, entertained an idea that Federal might, at some time, acquire the securities from Commonwealth.

The secrecy aspect of the July thirty-first "finder's agreement" must be considered in the light of the circumstances: It was known that Borland, as early as March first, was interested in the purchase of the portfolio for plaintiff, as distinguished from Federal; early in July Borland told Parkinson that he was about to settle the bank and trade debts and Parkinson suggested that it might be wiser to use the money to acquire the securities held by Commonwealth; Borland rejected the suggestion, saying he did not need or want any advice from Parkinson; Parkinson, in turn, made the suggestion to Smith, and, after consideration, Smith concluded that the purchase of the securities by Federal was not practical. Whatever motivated the desire for secrecy, there is nothing in the record to indicate that this secrecy was directed at the defeat of any known corporate purpose so far as Federal was concerned. As we read the record, it was directed toward Borland in his personal capacity and his personal relations with the plaintiff.

The appellants place great reliance on the case of *Billings* v. *Shaw* (209 N. Y. 265). In that case one St. John was the owner, as executor, of bonds and unpaid coupons of a corporation, aggregating $400,000; of promissory notes of the corporation, amounting to over $600,000; of an open account against the corporation, amounting to $42,000; and of two-thirds of its stock. St. John was president and a director of the corporation. He gave fellow-directors, Shaw and Chamberlin, an option to purchase the holdings for $332,250 cash. A meeting of the directors was held, which authorized a sale of the corporation's plant for $310,000. This sum, realized on the sale, together with $22,250 from the corporation's treasury, was paid to St. John, as executor. St. John transferred the bonds and unpaid coupons to the corporation, and to Shaw and Chamberlin the $600,000 of notes, the $42,000 open account, and the stock. No one of these three directors disclosed to the other director of the corporation that the $332,250 was the purchase price of the entire lot, the bonds, the notes, the open account, and the stock. That case is readily distinguishable from the case at bar because

of the outstanding fact that the corporate funds were used for the purchase of the securities, and Chamberlin and Shaw, two of the directors, appropriated a part of the securities to themselves. They were enabled to do so by the failure of St. John, the third director, to disclose the real nature of the transaction.

In the sale to Barney Johnson & Company, Parkinson was the agent of Commonwealth. After Parkinson introduced Johnson to Smith, the dealings were between Smith, on behalf of Commonwealth, and Johnson, on behalf of his company, with Parkinson standing by in the role of broker or "finder." Nothing in the record indicates that Barney Johnson & Company knew or ought to have known that Smith and Parkinson were doing anything which might in any way be in competition with or opposition to Federal. Johnson's testimony indicates that he knew or assumed that Smith and Parkinson were directors of Federal. He was not, however, buying from one director of Federal through another; he was buying from Commonwealth property belonging to it. There was nothing to indicate that there was anything improper in the transaction. Parkinson was a stranger to Johnson and, to Johnson, Parkinson appeared only as broker. No attempt has been made to show notice or knowledge on the part of Johnson of the alleged plan for Federal to acquire the portfolio, and there was no duty on the part of Johnson to inquire into intra-corporate affairs of Federal or inter-corporate affairs of Federal and Commonwealth. Johnson was buying from Commonwealth property which Commonwealth had an absolute right to sell. There was no obligation on the part of Commonwealth to first offer the securities to Federal. Johnson's contract is a separate and independent contract; Johnson & Company have no interest in the Parkinson contract, and the whole transaction, so far as Johnson & Company is concerned, is separate and not integrated. While Parkinson's contract is dependent upon performance by Johnson & Company, that fact does not make the two contracts an integrated transaction. The appellants are entitled to no relief so far as the Johnson & Company contract is concerned.

An attempt has been made to show that Commonwealth Subsidiary Corporation dominated Federal Electric Company, Inc., and occupied fiduciary relationship to the latter company. No act of control or domination is complained of. The trial court found that there is no evidence that Commonwealth at any time dominated, controlled or directed the business and affairs of Federal. Nothing has been developed on this appeal which leads us to conclude that that finding is not supported by the evidence. No fiduciary relationship arose because of the debtor and creditor

relationship, and the stockholdings created no fiduciary relationship. Commonwealth made no attempt to conceal the fact that it was willing to sell the securities at a discount from the face amount of the note, but Federal at no time ever made a proposition to buy. Commonwealth was free to sell to any buyer which might meet its terms and its eventual sale of the large note was a sale to a complete stranger to everyone concerned.

In the final analysis, the situation here is a simple one: Commonwealth owned securities of Federal which it was willing to sell at a discount. Federal well knew that, but made no known effort to buy. A director of Federal obtained an authorization from Commonwealth to find a buyer for the securities, and kept his proposition secret from the president of Federal. A contract has been entered into to sell the securities to a stranger, and now Federal says that the secrecy interfered with the mental plan of its president to acquire the securities. The plan was never formulated and was not disclosed to any other officer or director. In the absence of proof that the director acted in opposition to or in competition with his corporation, the contract for the sale of the securities may not be upset.

The plan for financing proposed by Federal in support of its contention, that it is ready and able to purchase the securities, is, as suggested above, open to serious question. Claude Neon Federal Company, a subsidiary of Federal, is engaged in the business of owning, leasing and maintaining electric signs and displays. Federal manfactures the signs and displays and attends to servicing them. The proposed method of obtaining the purchase money is as follows: Claude Neon Federal was to obtain a loan of $550,000 secured by deferred-payment contracts covering the leasing and maintenance of the electric signs and displays. The money obtained on the loan was to be used, partly for the distribution of dividends and partly for the purchase of outstanding preferred stock. Federal owned sixty-six and two-thirds per cent of the capital stock of Claude Neon Federal Company, and plaintiff owns twenty-five per cent of the stock. As a result of the distribution by Claude Neon Federal Company, plaintiff would receive approximately $126,250 and Federal would receive approximately $337,000. They were to combine so as to enable Federal to make up the purchase price of $450,000. In this court one of the stockholders' committees asserts that under the proposed plan the increased interest charges to January 1, 1941 (the due date of the larger note), would have been about $77,183.20, and that the plan is not beneficial but, instead, is detrimental in respect to cost; that the new obligation would be secured instead of, as at present, unsecured, and, in effect,

would be a demand obligation in the place of a funded indebtedness; the proposed plan would exhaust Federal's credit and, after the moneys borrowed had been disbursed, Federal would have practically no working capital; it is pointed out that a revolving credit is essential to the continuance of the business of Federal and its subsidiary, Claude Neon Federal Company, and that the proposed plan would have vested in the lender a power of life and death over Federal and its subsidiaries. In April, 1936, the president of Federal wrote Commonwealth that there were no earnings available to pay interest on the notes held by Commonwealth; that interest amounted to $36,636.80; under the proposed plan the annual interest charges would have been at least $69,500, and the stockholders' committee points out that is one of the vicious aspects of the proposed plan. However, neither corporation has taken any corporate action toward consummation of the plan. The trial court found that Federal is not ready, able and willing to perform the contracts of Barney Johnson & Company and Parkinson with Commonwealth, even if said contracts were impressed with a trust, and the record justifies that finding.

In order to carry out the proposed finance plan it is necessary for Claude Neon Federal Company to pledge itself to sell its contracts. It is urged that Claude Neon Federal Company is a Delaware corporation, not a party to this action, and only two of its six directors are before this court, and that this court is powerless to compel action on the part of that company. Were the appellants entitled to any relief here, a decree could be made effective by a provision requiring Commonwealth to deliver to Federal the portfolio involved upon condition that, within a specified time, Federal pay to Commonwealth the sum designated. No company not a party to this action would be bound thereby, but it would be dependent upon the ability of the appellants to bring about appropriate action by the Delaware corporation. However, it is unnecessary to pursue that question further as we hold appellants are entitled to no relief.

The plaintiff maintains that, nevertheless, it is entitled to judgment against Federal because it consented to certain inter-corporate arrangements in connection with the settlement of the trade and bank creditors upon the representation that Federal Electric Company, Inc., would use its best efforts to carry out what is referred to as step No. 2 and acquire the securities from Commonwealth; in turn, plaintiff was to receive up to $210,000 of the notes and a proportionate share of the stock. It is unnecessary to consider the fact that plaintiff was the owner of a one-quarter interest in the subsidiaries involved, whereas Federal owned two-thirds of the

stock, and, because of such majority, might be able to accomplish the desired result despite any opposition on the part of plaintiff. The book of the minutes of the meetings of the board of directors of the plaintiff disclosed, however, that while plaintiff originally endeavored to obtain assurances from Borland with reference to the purchase of the portfolio owned by Commonwealth and the passing on to plaintiff of a part thereof, that endeavor was not carried through and a more satisfactory arrangement was agreed upon under which plaintiff received a large sum in dividends from Claude Neon Federal Company and an extension of the maturity of a $10,000 note owing by it to Federal and, in addition, a loan of $25,000 from a subsidiary of Federal. Assuming, however, that the representations claimed by plaintiff had been made and that plaintiff relied on them, despite obviously collusive admissions in the pleadings, the record makes it clear that Borland never had any authority to bind Federal in that respect. The board of directors of Federal never authorized Borland to conduct any negotiations with plaintiff with respect to the purchase of securities owned by Commonwealth, and none of the directors knew that Borland had made any such representations. The business of Federal was the manufacture, sale and servicing of signs. A major financial transaction such as is here involved is outside the scope of the ordinary business of Federal, and plaintiff was put upon inquiry as to Borland's authority in the premises. The record shows a complete lack of authority, actual or implied, a complete ignorance of the other directors of Federal with respect to any such representation, and the trial court was justified in finding that any representations made to plaintiff with respect to the purchase by Federal of the portfolio and the acquisition of a portion thereof by plaintiff was beyond the scope of the authority of Borland, as president. The trial court found that the plaintiff suffered no damage as a result of the utilization of funds in the settlement by Federal with its bank and trade creditors.

The judgment appealed from should be affirmed, with costs.

Townley, J., concurs.

McAvoy, J. Plaintiff's amended complaint demands a judgment of specific performance compelling the defendants, upon payment to them of $450,000, to deliver to the defendant Federal Electric Company, Inc., and plaintiff, what is herein called the portfolio of the defendant Commonwealth Subsidiary Corporation, consisting of (1) a seven per centum promissory note from Federal Electric Company, Inc., to Commonwealth Subsidiary Corporation in the amount of $856,000, maturing January 1, 1941; (2) a four per centum promissory note of Federal Electric Company, Inc.,

to Commonwealth Subsidiary Corporation in the amount of $59,920, maturing January 1, 1937; (3) 3,560 shares of six-dollar prior preferred stock of Federal Electric Company, Inc.; (4) 4,721 shares of seven-dollar preferred stock of Federal Electric Company, Inc., and (5) 12,393 shares of common stock of Federal Electric Company, Inc.

In the event specific performance cannot be decreed, plaintiff asks, in the alternative, that it have an accounting by the defendant Federal Electric Company, Inc., for all moneys it received from the plaintiff under a promise and representation that the plaintiff and defendant Federal Electric Company, Inc., would acquire said portfolio and perform what is called " step 2 " in matters arising out of previous transactions among some of the parties.

The prayer of Federal Electric Company, Inc.'s cross-complaint against the codefendants is to impose a constructive trust upon the *res* of a secret sale by the defendant Purcell L. Smith, a director of Federal Electric Company, Inc., to the defendant, and fellow director, Roscoe Parkinson, and his associate, Barney Johnson & Company, of a so-called " portfolio " of the corporate obligations and stock of Federal Electric Company, Inc., at a time when both these directors knew that their company itself wished to acquire this portfolio and was actually making plans to retire these obligations and such stock.

The sale was discovered before a transfer or delivery of the securities, and its consummation was prevented by injunctive proceedings.

The securities are still held by Commonwealth Subsidiary Corporation, subject to its asserted right to deliver the same to Parkinson and his associate upon the payment of $450,000.

Plaintiff, Claude Neon Lights, Inc., owns approximately one-quarter of the outstanding capital stock of Claude Neon Federal Company, two-thirds of the stock of which is held by Federal Electric Company, Inc. The plaintiff is the company from whom Federal Electric Company, Inc., procured and now holds its license for the sale of " Neon " display signs.

Defendant Federal Electric Company, Inc., is a New York corporation, with factories and headquarters in Chicago. Its business is the manufacture, sale and servicing of electric signs and displays. Under a license held by it from the plaintiff, it also manufactures and sells what are known as " Neon " electric signs.

Defendant Charles Borland is the president of the Federal Electric Company, Inc.

Defendant Barney Johnson & Company is a Wisconsin corporation engaged in the investment banking and brokerage business in Wisconsin and Illinois.

Defendant Roscoe Parkinson had been a director of Federal Electric Company, Inc., but he resigned his office simultaneously with the consummation of the deal which is under attack in this litigation.

Defendant Purcell L. Smith is a vice-president of defendant Commonwealth Subsidiary Corporation and of the Commonwealth Edison Company, which owns the Commonwealth Subsidiary Corporation. He has been a director of defendant Federal Electric since March, 1934, when he and one deClercq, an employee of Commonwealth Edison, were designated by Commonwealth Subsidiary as its representatives on Federal Electric's board of five directors.

B. L. Trillich is today a director of Federal Electric, having succeeded Mr. Parkinson upon the latter's resignation in August, 1935. Early in 1935 Mr. Trillich was engaged to work on Federal's refinancing problems.

In 1932 defendant Federal Electric was indebted to certain banks and trade creditors in an amount exceeding $600,000. The banks insisted that disbursements of Federal Electric be subject to control of a representative named by the Continental Illinois National Bank and Trust Company of Chicago. The Continental Bank named defendant Mr. Parkinson as its representative. All disbursements had to be made with his approval. Federal Electric paid Mr. Parkinson a salary from November 1, 1932, to August 17, 1935.

Since the organization of Federal Electric, the Commonwealth Edison and Commonwealth Subsidiary Corporations have had a large influence in the affairs of Federal Electric, due to their stockholdings, their officers and directors who have from time to time served as directors of Federal Electric, their business dealings with Federal Electric, and financial assistance, their access to all records of Federal Electric and because Commonwealth Subsidiary Corporation in recent years has been and now is the largest single creditor of Federal Electric.

Federal Electric Company, Inc., was being operated under the supervision of its bank creditors in 1933. Mr. Gilchrist, president of the company, asked Mr. Trillich, a friend of his, to work out a plan of operations acceptable to the banks. Early in 1934 suits were being threatened. Some plan for getting the creditors to sign a " standstill " agreement became essential. A " standstill agreement " was finally worked out in the year 1934, being dated as of January first of that year. Commonwealth Subsidiary held

Federal Electric's note for $856,000, dated December 31, 1930, on which interest for 1933 was unpaid, amounting to $59,920. The agreement provided that Commonwealth was to take a note for $59,920 in lieu of cash; that the banks and creditors were to "standstill" until January 1, 1937, getting interest monthly on their accounts and certain annual payments on principal; that Mr. Borland, then manager of Federal Electric, was to be made its president; that the board of directors was to be reduced from nine to five in number. Mr. Smith was to nominate two directors, and the bank and trade creditors two, and Mr. Borland was to be the fifth.

Mr. Smith nominated himself and Mr. de Clercq as directors of Federal Electric. Mr. Borland was given the privilege of nominating the fourth director "subject to the approval of the trade creditors," and he named a Mr. Kehl, of St. Louis, president of Federal Brilliant Company, a subsidiary of Federal Electric. These four men, with Mr. Parkinson, were elected directors at the annual meetings of the stockholders in March, 1934, and again in 1935.

By the end of the year 1934, Mr. Borland was considering plans for the permanent solution of the company's financial problems which had been cared for only temporarily in the "standstill" agreement. At that time the company's obligations were its indebtedness to its bank and trade creditors amounting to $647,000, and its indebtedness to Commonwealth Subsidiary on the two notes, aggregating $915,000.

In the early part of 1935, Federal Electric undertook a plan of reorganization of its financial affairs consisting of the acquisition from Commonwealth Subsidiary of the two notes and all the shares of three classes owned by Commonwealth Subsidiary, and a settlement with bank and trade creditors to discharge the indebtedness to them under the "standstill" agreement.

Mr. Smith let it be known that Commonwealth Subsidiary was willing to make a sale of the "portfolio" at a very substantial discount. The price was quoted at $500,000. If the bank and trade obligations of Federal Electric could also be purchased at a discount, an unusual opportunity would be at hand to refund all of its then outstanding indebtedness and to retire twenty-eight per cent of its outstanding capital stock. Federal Electric estimated that approximately $1,000,000 would be needed to accomplish this. At that time Federal Electric and its subsidiaries had about $600,000 in cash and total assets aggregating more than $3,000,000. It seemed reasonable to expect that the necessary additional cash could be raised. The Federal Electric's record for 1934 was good,

the bank and trade creditors had been paid their interest, and over ten per cent on their principal. Mr. Borland felt certain that arrangements could be made to retire the Federal Electric's indebtedness.

As a part of the plan, Mr. Borland (then and now president of Federal Electric) procured an option dated March 1, 1935, to acquire all the notes and shares of stock of Federal Electric owned by Commonwealth Subsidiary Corporation. During the period of the option and until the early part of May, 1935, negotiations were conducted by Federal Electric, through Mr. Borland and Mr. Trillich, looking to the exercise of the option, but it was ascertained that the funds could not be procured on a satisfactory and reasonable basis so long as it had outstanding liabilities to bank and trade creditors under the "standstill" agreement. In the early part of May, 1935, Federal Electric advised Mr. Smith that it was then unable to purchase its notes and securities owned by Commonwealth Subsidiary, because of the terms and conditions of the "standstill" agreement; that Mr. Borland and Mr. Trillich had evolved a plan for settlement with the bank and trade creditors for a discharge of their claims, and after the accomplishment of that settlement it would be possible and practicable for Federal Electric to acquire the notes and shares of stock owned by the Commonwealth Subsidiary.

During the negotiations there were numerous discussions of the plan between Mr. Trillich and Mr. Smith, in the course of which Mr. Smith conferred with the certified accountants for Federal Electric, and about June 12, 1935, Mr. Smith consented to a proposed settlement with bank and trade creditors on condition that the discount on the settlement should be not less than $100,000; that open lines of bank credit be established for Claude Neon Federal Company and Federal Brilliant Company to the total amount of $150,000, and that the consent of Claude Neon Lights, Inc. (plaintiff), be obtained to the passing up to Federal Electric of the necessary funds from the subsidiaries of Federal Electric in which Claude Neon Lights, Inc., held substantial direct or indirect minority stock interests; all three of which conditions were met by arrangements with bank and trade creditors and banks by July 25, 1935, and Mr. Smith was so advised on that date.

This plan involved, among other things, a loan by Claude Neon Federal Company to Federal Electric of $170,000 and the redemption by Federal Brilliant of 2,000 shares of preferred stock of Federal Brilliant owned by Federal Electric, by the payment by Federal Brilliant to Federal Electric of $200,000 plus accrued dividends.

Federal Electric for many years has owned and now owns two-thirds of both the preferred and common stocks of Claude Neon Federal; and Claude Neon Lights, Inc. (plaintiff), for many years has owned and now owns one-fourth of both the preferred and common stocks of Claude Neon Federal. In view of the interest of plaintiff in the Claude Neon Federal, and through Claude Neon Federal in the Federal Brilliant, it was necessary to obtain the consent and approval of plaintiff to the proposed loan by Claude Neon Federal of $170,000 to Federal Electric, and to the proposed redemption by the Federal Brilliant of the 2,000 shares of its preferred stock owned by Federal Electric, by the payment to Federal Electric by Federal Brilliant of $200,000.

Mr. Borland and Mr. Trillich induced the directors of plaintiff to give their consent and approval to the transactions by representing that Federal Electric would use its best efforts to accomplish the settlement with the bank and trade creditors, and to accomplish the acquisition of the notes and stocks owned by Commonwealth Subsidiary.

During the negotiations Mr. Trillich informed Mr. Smith that, in order to obtain the consent of the plaintiff to the acts required to consummate a settlement, it was necessary to enter into the understanding with plaintiff in respect to the acquisition by Federal Electric of the notes and securities held by Commonwealth Subsidiary.

On August 15, 1935, Federal Electric consummated a settlement under which all the bank and trade creditors accepted eighty per cent of the principal amount of their respective claims as of that date, plus interest to August 15, 1935, in full payment — claims in the aggregate amount of $647,515.68 having thus been canceled by the payment of $518,012.54.

Mr. Smith, Mr. deClercq and Mr. Parkinson, in addition to being directors of Federal Electric, were directors of Claude Neon Federal, and as directors of both corporations voted in favor of resolutions and performed other acts that were necessary to cause the funds to be made available by Claude Neon Federal and Federal Brilliant to Federal Electric, so that Federal Electric could consummate the settlement as of August 15, 1935.

During the time Federal Electric was working out its plan, Mr. Smith, Mr. deClercq and Mr. Parkinson knew that it was to the advantage of Federal Electric to acquire from Commonwealth Subsidiary the notes and stocks of Federal Electric at a price substantially less than the face amount of the notes.

Several days after Mr. Smith was informed that all the conditions had been met for the consummation of the settlement,

he, as an officer of Commonwealth Subsidiary, secretly made an agreement with his codirector in Federal Electric, Mr. Parkinson, giving him an option to purchase the notes and shares of Federal Electric held by Commonwealth Subsidiary. This agreement was known only to Mr. deClercq. Subsequent to this agreement between Commonwealth Subsidiary and Mr. Parkinson, the Commonwealth Subsidiary, or Mr. Parkinson, secretly entered into some alleged oral agreement with defendant Barney Johnson & Company for a purported sale of the $856,000 note.

Defendant Barney Johnson & Company knew that Mr. Smith, Mr. deClercq and Mr. Parkinson were directors of Federal Electric and that together they constituted a majority of the board of directors of Federal Electric. Defendant Barney Johnson & Company also knew that Mr. Parkinson, as a representative of creditors in control of disbursements of Federal Electric, occupied a position of trust and confidence.

At a meeting of the directors of Federal Electric, August 23, 1935, defendant Mr. Smith presented a resolution providing for a split-up of the $856,000 promissory note into 856 notes each of the denomination of $1,000. Thereafter Mr. Smith informed Mr. Trillich, his codirector, that he was negotiating for a sale of the securities of Federal Electric held by Commonwealth Subsidiary Corporation. This was the first information received by Federal Electric that Commonwealth Subsidiary had any negotiations for the sale of the securities to any other than Federal Electric. The meeting was adjourned to September 4, 1935, when the resolution was again presented by Mr. Smith. It did not pass the first time, but later in the meeting Mr. Smith stated that the split-up of the note for $856,000 was requested for the purpose of making a distribution of all or a part of the $1,000 pieces proposed to be issued; that a sale had been made, and that the sale would be consummated regardless of whether the resolution was adopted; then the resolution was again presented. Mr. Borland, Mr. Trillich and Mr. Kehl did not have any knowledge of the existence of the options granted to Mr. Parkinson, nor had they any knowledge that the negotiations and sale referred to by Mr. Smith also included the transfer to Mr. Parkinson of the note for $59,920, due January 1, 1937, and the shares of stock of Federal Electric held by Commonwealth Subsidiary, the acquisition of which by Federal Electric was then contemplated as a part of the rearrangement of the financial affairs of Federal Electric. In ignorance of the secret agreements, directors Borland and Kehl voted in favor of it, director Trillich not voting.

On September 11, 1935, Mr. Borland and Mr. Trillich learned that Barney Johnson & Company claimed to have purchased the split-up notes of $1,000 denominations, totaling $856,000, and proposed to distribute and sell them to the public. They made demand upon Mr. Smith that he cause to be sold and delivered to Federal Electric the notes and shares of stock at the price for which they were purported to have been sold to Mr. Parkinson, or Barney Johnson & Company. Mr. Smith has since failed and refused to comply therewith.

At that time Mr. Smith was asked to divulge the names of the purchasers of the notes, and the shares of stock, but he refused to name them. Mr. Smith failed to disclose that, in behalf of Commonwealth Subsidiary, he had made an agreement on July 31, 1935, with Mr. Parkinson to sell to Mr. Parkinson the $59,920 note and shares of stock of Federal Electric, and that Barney Johnson & Company was the purchaser of the $856,000 note, and knew when it contracted to purchase it that Mr. Smith and Mr. Parkinson were directors of Federal Electric.

Defendants Parkinson and Smith sold or contracted to sell the $856,000 note to Barney Johnson & Company for $428,000, and the Commonwealth Subsidiary has sold to defendant Parkinson the $59,920 note and all the stock of Federal Electric held by Commonwealth Subsidiary for $22,000.

Plaintiff, Claude Neon Lights, Inc., contends that it is entitled to the relief sought, because it consented that the Claude Neon Federal loan and the Federal Brilliant supply the funds to be used to pay off the bank and trade creditors on the promise and representation that the Federal Electric would acquire the portfolio of the Commonwealth Subsidiary Corporation; that it is entitled to a decree that the parties now perform the second part of the refinancing plan by delivering the notes and securities in litigation to defendant Federal Electric upon payment of $450,000.

Defendant Federal Electric states that it did not promise or represent that " step 2 " would be completed. It simply promised and represented that it would use its best efforts to carry through " step 2." as promptly as possible, and, in the event " step 2 " was carried out, that plaintiff would receive benefits according to a formula which has been discussed.

Defendant Federal Electric contends that if the agreements between defendants Commonwealth Subsidiary Corporation, Parkinson and Barney Johnson & Company are carried out, it and its shareholders will be damaged in at least the sum of $465,000, and defendant Parkinson will be unlawfully enriched to the extent of owning the $59,920 note of Federal Electric and the shares of

stock, all of which he would acquire without cost to himself, when in justice and in right the notes and shares should become the property of Federal Electric Company, Inc.; therefore, a constructive trust should be imposed upon the secret sale.

Defendants Barney Johnson, individually, and Barney Johnson & Company contend that plaintiff and defendant Federal Electric have failed to prove any cause of action as against them, that neither Parkinson nor Smith, nor Commonwealth Subsidiary breached any duty owing by them or any of them to Federal Electric, because Federal Electric never had developed a corporate plan or purpose in respect of the Commonwealth securities; that Parkinson, Smith and Commonwealth Subsidiary knew nothing of Federal Electric's plan of refinancing; that no fiduciary duty was owed by them to Federal Electric; that a court of equity in the circumstances here present will not and is without power to grant the relief Federal Electric and Claude Neon Lights, Inc., request.

Defendant Parkinson contends that any purchase or contract to purchase by Federal Electric of its own stock would have been and now is unauthorized and void, due to the fact that it now has and for a long time has had a capital deficit; that a court of equity will not intervene to enforce, aid or allow the performance of an illegal contract, hence, this court will not decree that Federal Electric should be allowed to perform Parkinson's contract and so purchase 20,674 shares of its own stock. He also contends that directors are free to purchase and deal in issued stock of the corporation, and in so doing do not in any manner violate any fiduciary relation.

Defendant Smith contends that it was not the purpose of Federal Electric to acquire the securities, and it was not making plans to retire them; that he did not know of any plan evolved after March 1, 1935, and if it were, Borland kept it secret; that Federal Electric is legally disabled from purchasing its own securities.

Commonwealth Subsidiary Corporation contends that no fiduciary relationship has been established between it and Federal Electric which would disable it from disposing of the securities as it sees fit; that plaintiff has neither pleaded nor proved any contract between Commonwealth Subsidiary and Federal Electric which can be the subject of a decree of specific performance; that neither Borland nor Trillich had actual or apparent authority to deal with plaintiff on behalf of Federal Electric, and plaintiff was not justified or warranted in relying on statements or representations made by either of them; and that plaintiff suffered no damage by the consummation of so-called " step 1 " and the failure to consummate the proposed " step 2."

When two directors silently and secretly use their respective powers for personal advantage and profit and the advantage and profit of a third party, and the transaction relates specifically to property of the corporation itself which it needs and could acquire at an advantageous discount, the transaction contains every element of a fraudulent transaction and their conduct charges both directors with a duty to account. " *Fraus est celare fraudem.* It is a fraud to conceal a fraud. 1 Vern. 240." (2 Bouvier's Law Dict. [Rawle's 3d Rev.] 2135.)

Directors Smith, deClercq and Parkinson, during their tenures of office with Federal Electric, were bound to reveal to, and not to conceal from the corporation, all facts of which each had knowledge affecting Federal Electric's welfare and interest. Each was bound to advise and consult with all directors and officers of the corporation with reference to matters affecting its interest. The morals of the mart of trade will not do. A punctilio of highest honor is the inveterate demand of equity.

Neither directors Smith, Parkinson nor deClercq told the president or any other officer or director of Federal Electric of their dealings. Mr. Parkinson and Mr. Smith admitted that they wished to have knowledge of it kept from Mr. Borland and Mr. Trillich.

Barney Johnson & Company knew that Parkinson and Smith were directors of Federal Electric during all of the time that it was negotiating with Parkinson. One who knowingly joins a fiduciary in an enterprise, where the personal interest of the latter is or may be antagonistic to his trust, becomes jointly and severally liable with him for the profits of the enterprise. (*Lonsdale* v. *Speyer*, 249 App. Div. 127.)

There is evidence that a reliable finance company was and is ready and willing to finance the transaction for Federal Electric to acquire these notes and the stock for the principal benefit of the stockholders of the Federal Electric.

As to the contention that Federal Electric Company, Inc., is forbidden to acquire its stock by section 664 of the Penal Law of the State of New York, because it lacks a capital surplus, Federal Electric is not trying to purchase shares of its stock, it is trying to acquire a portfolio consisting of two of its notes and a certain block of its preferred and common shares for a price less than half of the face amount of the notes alone. Federal Electric is trying to acquire a bundle or portfolio which includes capital stock. A corporation is not precluded from availing itself of the opportunity of retiring its outstanding obligations on advantageous terms, simply because the benefits additionally insured to the corporation include the acquisition at the same time of its capital stock.

The plaintiff here has not been wronged by defendant Federal Electric Company, Inc. It has been wronged, as Federal Electric Company, Inc., has been wronged by two of the directors of Federal Electric Company, Inc., violating their fiduciary duties and thereby making it impossible to carry through " step 2."

A court of equity, having obtained jurisdiction, has authority to make a decree thereafter to effectuate the relief required to do justice.

A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. (*Beatty* v. *Guggenheim Exploration Co..* 225 N. Y. 380, 386.)

Therefore, a constructive trust of the entire portfolio should be declared in favor of Federal Electric Company, Inc., and its stockholders.

The judgment should be reversed, with costs, and judgment directed for plaintiff on its complaint, with costs, and judgment directed for defendant Federal Electric Company, Inc., on its cross-complaint, against defendants other than Federal Electric Company, Inc., with costs.

O'MALLEY, J., concurs.

COHN, J. For the reasons set forth in the opinion of Mr. Presiding Justice MARTIN, I concur in the holding that appellants are entitled to no relief so far as the Johnson & Company contract is concerned. In so far as the Parkinson contract is held to be the subject of a constructive trust in favor of the defendant Federal Electric Company, Inc., I concur in the opinion of Mr. Justice McAVOY.

I, therefore, vote to modify the judgment by decreeing that the defendant Federal Electric Company, Inc., is entitled to have imposed a constructive trust in its favor upon the separate contract of defendant Roscoe L. Parkinson with the defendant Commonwealth Subsidiary Corporation wherein it sold to defendant Parkinson the note of $59,920, and all the stock of Federal Electric Company, Inc., held by it, for the sum of $22,000; and that as so modified the judgment should be affirmed.

Judgment modified by decreeing that the defendant Federal Electric Company, Inc., is entitled to have imposed a constructive trust in its favor upon the separate contract of defendant Roscoe L. Parkinson with the defendant Commonwealth Subsidiary Corporation, wherein it sold to defendant Parkinson the note of $59,920, and all the stock of Federal Electric Company, Inc., held by it,

534

for the sum of $22,000; and as so modified affirmed. Settle order on notice, reversing the findings inconsistent with this determination and containing such new findings of facts proved upon the trial as are necessary to sustain the judgment hereby directed.